Chief Judge Conway.
Defendants stand convicted of the crime of conspiracy to commit false advertising over a radio station and in other ways in violation of section 421 of the Penal Law.
The information filed against them contains two counts.
In the first count, defendants are accused of a conspiracy to commit the crime of violation of section 421 of the Penal Law in that, in the County of Kings, defendants continuously from June, 1953 to December, 1954, with intent to sell and dispose of merchandise, to wit, sewing machines and attachments and appurtenances thereto, offered by them for sale to the public corruptly conspired and agreed to disseminate and place before the public in this State over a radio station and in other ways, advertisements regarding such merchandise; that such advertisements contained assertions, representations and statements *465 of fact which were untrue, deceptive and misleading, and that such advertisements over said radio station were intended to be, and were, heard by the public in Kings County.
As part of the first count, the information recites five overt acts committed by defendants in furtherance of the conspiracy: (1) that on December 7,1953 defendants entered into a contract with television station WATY for the telecasting of a commercial advertisement prepared by defendants, (2) that in and about the month of November, 1953, defendants instructed an employee to enter fictitious sales in the books and records of defendant Atlantic Sewing Stores, Inc., at $23 a machine, (3) that in or about the month of May, 1954, defendant G-lubo instructed a salesman for defendant Atlantic Sewing Stores, Inc., not to sell the sewing machine advertised, under any circumstances, at the advertised price of $29.50, (4) that in or about the month of May, 1954, defendants instructed a salesman in the method of rigging a $29.50 sewing machine so that it would not work for the customer when demonstrated for the purpose of discouraging said customer from purchasing the machine at the advertised price and (5) that in or about the month of July, 1954, defendants’ salesman informed a prospective customer in Kings County that the advertised machine was made of cast iron and was cheap and advised said customer not to buy it.
In the second count defendants are accused of violating said section 421 in that defendants, in the same county, during the same period and with the same intent, in the form of a live commercial television announcement, over a television station, disseminated and placed before the public an advertisement regarding such sewing machines, and that such advertisement contained an assertion, representation, and statement of fact which was untrue, deceptive and misleading, in that it was falsely represented that defendants would sell a “ Queen Anne Console Magic Stitcher” sewing machine with a sewing chair for the price of $29.50, whereas in truth and in fact defendants did not intend to sell the article so advertised at the stated price.
The second count of the information, by which defendants were accused of the substantive crime of false advertising in violation of section 421 of the Penal Law, was dismissed at the end of the People’s case upon motion of the defendants, the trial court stating that it was dismissing such count upon the *466 ground that “asa matter of law * * * no crime was committed in Kings County.” Thereafter, the court found defendants guilty of the first, or conspiracy, count. Bach of the individuals was sentenced to a fine of $500 or 90 days, and 4 months in the city prison, the latter part of the sentence being suspended. The corporate defendant was fined $500.
The record discloses the following facts: At the time of the alleged crime, the defendants were engaged in the business of selling sewing machines throughout the metropolitan area. They operated under the firm name of Atlantic Sewing Stores, Inc. (the corporate defendant), and their place of business was located in Queens County. To obtain and increase the sale of their sewing machines, defendants determined to procure leads to prospective customers, in part by advertising over the medium of television. Shortly before December 10,1953 defendants entered into an agreement to broadcast or telecast over station WATV, located in Newark, New Jersey, but received all over the metropolitan area, an advertisement which offered to sell “ for the closeout price of just $29.50,” a “ beautiful Queen Anne console * * #, a fine sewing chair with large storage compartment ” and a “ brand new 1954 model top quality sewing machine” with “the sensational new, exclusive Magic Stitcher ’ ’ which darns, mends, embroiders, monograms, sews on zippers, appliques, quilts, sews over pins and needles and sews forward and reverse — all without additional attachments. The advertisement further offered to the first 50 persons to call the telephone numbers given by the announcer “ if you do decide to buy ” a “ gorgeous 22 piece sewing kit, including a pair of pinking shears.”
It seems quite clear from the evidence that defendants agreed that they would systematically subvert the sale of the $29.50 machine by proving to prospective customers that the advertised machine was actually of inferior quality and could not function properly, with the intent and purpose of bringing about a “ step up ” sale, i.e., a sale of a higher priced machine. The “ step up ” scheme was to be operated as follows: In response to an inquiry for the $29.50 Magic Stitcher, defendants would first send to the prospective customer’s home a so-called “ lead man” who would take the customer’s order by accepting a deposit of as little as 25 cents on the $29.50 machine and who *467 would then advise the customer that another man would deliver the machine and would instruct the customer in its operation. Thereafter, the second man, known as a “ BF ” man, would visit the customer, demonstrate the $29.50 machine, undertake to prove it to be inoperable and point out that it was basically defective and inferior, and then attempt to persuade the customer to order a better sewing machine at a much higher price. Should the “BF” man fail in his efforts to “step up” the sale, he would leave with the $29.50 machine and the customer’s deposit would subsequently be returned by mail. Commissions were earned on the sale of the higher priced machines only.
In pursuance of their agreement to “ kill ” the sale of the advertised machine and to “ step up ” the customer, defendants conducted instruction sessions or clinics for the salesmen. The sales pitch and selling methods used by the “ BF ” men in attempting to switch the prospective customers from the advertised machine to the higher priced machine were numerous. For example, the advertised machine was rigged so that when it was demonstrated it would operate for the “ BF ” salesman but would jam up for the customer. The customer would be told that his television set would have to be turned off when the advertised machine was demonstrated, otherwise the television tube or fuses would blow out. The customer would be told that the machine would have to be oiled every few minutes; that a five-pound can of grease would be needed to pack the bearings; that the customer could lose an eye if the machine jammed and the needle broke; or that the customer had a heavy foot for sewing. The “ BF ” men were specifically instructed that they could not sell the $29.50 advertised machine. As mentioned above, after the customer had been discouraged from purchasing the $29.50 machine, the “ BF ” men would undertake to sell the higher priced machine.
Defendants maintain that they intended only to discourage the sale of the advertised $29.50 machine which, incidentally, cost the defendants $45, and that they always intended to sell the advertised product where the customer could not be “ switched.” They point to testimony of six witnesses who bought the advertised $29.50 machine and to the testimony of two others who purchased and received at the advertised price a “Square Bond” machine which, according to defendants’ *468 witnesses, was the same basic machine as the Magic Stitcher but having a different casing. Defendants also point to the fact that their records of sales reveal that, for the period May 31, 1953 to December 31, 1954, 26 of the advertised machines were sold.
In our judgment the intent of defendants to sell the advertised product is hardly spelled out by company records of 26 sales of advertised machines, 3 of which were fictitious, as hereinafter indicated. We say this because, while the defendants’ records of sales thus demonstrates that during the period May 31, 1953 to December 31, 1954 they sold 26 of the advertised machines, their records also reveal that during such period 10,951 customers entered into conditional sales contracts for the advertised machines. Between May of 1953 and December of 1953 there were 799 conditional sales contracts entered into for. the advertised machine. Of these, only three were entered on the books as sold. These three sales were fictitious and were entered in the records so that an examination of the books and records would show that advertised machines were sold. From January 1, 1954 to June 30, 1954, 3,161 conditional sales contracts for the advertised machine were entered into, but only one advertised machine was recorded as sold. From June 30, 1954 to December 31,1954, 6,991 conditional sales contracts were entered into. However, only 22 advertised machines are recorded as sold.
Thus, it will be seen that the bulk of the sales of the $29.50 machines took place during the period June to December, 1954. Seemingly by that time defendants had received a number of complaints from the television station and from the Better Business Bureau concerning their advertising and sales methods. So it would appear that the sales of the advertised machine were merely part of a well-calculated scheme to disguise or conceal defendants’ intent not to sell the advertised machine.
In brief, the record before us, read in its entirety, justifies the findings implicitly made below to the effect that when defendants originally planned the television advertising campaign in December of 1953, and for at least a considerable period of time thereafter while the advertising was continuing, defendants had no intention of making any sales of the advertised machines and that their salesmen, following their instructions. *469 implemented this negative intent by various means, and that it was defendants’ intention at all times to sell sewing machines which were higher priced than those advertised.
We think it advisable at this juncture to point out that the defendants were not charged with nor tried for conspiring to advertise falsely that the $29.50 machine had certain capacities and qualities which it did not in fact have. The question of the true capacities and qualities of the $29.50 machine was not litigated. The sole claim of falsity, upon which claim the information is based, is that defendants had no intention whatever of selling the machine they advertised for sale. In his opening statement'the prosecutor told the court that he would show that the defendants ‘[1] were not in the business to sell 29.50 machines ’ ’ and that ‘[1] Under no circumstances were the salesmen to sell a 29.50 machine ’ ’. What is more, the evidence adduced by the prosecutor was designed to prove an intent on the part of defendants not to sell the advertised product. The People’s case rests on the fact that defendants advertised for sale a sewing machine which they did not intend to sell in order to obtain leads so that they might sell a higher priced sewing machine.
fThis brings us to the first question of law presented, viz., whether the agreement of defendants to advertise for sale a sewing machine which they did not intend to sell in order to obtain leads to persons to whom they might sell a sewing machine which was not advertised constitutes a conspiracy to violate section 421 of the Penal Law.
Insofar as pertinent section 421 of the Penal Law read at the time of conviction: ‘[1] Any person * * * who, with intent to sell * * * merchandise, * * * or anything offered by such person, * * * directly or indirectly, to the public for sale or distribution, or with intent to increase the consumption thereof, * * * makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, * * * over any radio station or in any other way, an advertisement, announcement or statement of any sort regarding merchandise, * * * or anything so offered, * * * which advertisement contains any assertion, representation or statement of fact which is *470 untrue, deceptive or misleading, shall be guilty of a misdemeanor.”
Defendants’ contention is that they cannot be found guilty of violating section 421 for, to establish a violation of that section, it must be shown that defendants had the actual intent to sell the merchandise offered in the advertisement and here the People’s case proceeds on the contrary theory, i.e., that defendants did not sell the merchandise offered in the advertisement.
The People, on the other hand, urge that the statute requires proof of but three elements, namely, (1) an intent to sell merchandise, (2) the placing before the public of an announcement or statement of any sort regarding merchandise and (3) the existence in such statement or announcement of deceptive or misleading matter.
The People go on to argue that the three elements were proved in the present ease since (1) defendants intended to sell merchandise, to wit, sewing machines; (2) they caused an advertisement to be placed before the public over television regarding these sewing machines; and (3) the offer of defendants to sell sewing machines at $29.50 contained in that advertisement was an assertion or representation that was deceptive and misleading, in that defendants never intended to sell sewing machines at $29.50.
Defendants are quite correct in their assertion that section 421 requires proof of an “ actual intent ’ ’ to sell as distinguished from a “ prima facie intent ”, “ visible intent “ audible intent ” or “ ostensible present intent.” The words in penal statutes (indeed, the words in all statutes) are to be accorded their commonly accepted meaning in order that the citizenry may be apprised of exactly what is forbidden. Had it been the legislative purpose in enacting section 421 to depart from the ordinary meaning of “ intent ”—to give to the term a sense different from that in which it would be understood by the average citizen—the lawmakers could easily have selected phraseology designed to evidence that purpose. Instead, the lawmakers used the common word ‘[1] intent ’ ’ and a court interpreting or construing section 421 must give that word its natural and common meaning. There can be no doubt, of course, that actual intent may, under certain circumstances. *471 properly be inferred from one’s acts. Here, it is not possible to draw the inference that defendants actually intended to seE the Magic Stitcher from the fact that they advertised to sell it, in the face of the theory of the People, and the proof adduced in support thereof, which establishes beyond doubt that defendants did not intend to sell the advertised Magic Stitcher.
While we agree with defendants that section 421 requires proof of an actual intent to sell, we part company with the defendants, however, at the point where defendants argue that to violate section 421 they must actuaEy intend to sell the particular item of merchandise falsely advertised. The statute does not so read. It states simply that a merchant is guilty of violating its provisions if “ with intent to seE * * * merchandise ” he places before the public an advertisement “ regarding merchandise” whieh advertisement is false. Defendants did just that. With actual intent to seE expensive sewing machines defendants placed before the public a false advertisement regarding inexpensive sewing machines. Just as defendants had planned, the credulous were duped by the advertisement. The statute evinces the sweeping intent of the Legislature to make it unlawful to advertise as a fact that which is not a fact. Nowhere does it appear, by any semantic twist, that the Legislature limited the crime to a deceptive or. misleading advertisement as to the particular item advertised.
Although there is no claim or proof that defendants cheated or defrauded any who purchased sewing machines from them (by which we mean that for all that appears and for all that is claimed [a] the defendants made no false representations concerning the machines they did sell and [b] the sewing machines sold by defendants were worth the money paid therefor), defendants did put before the public a false and misleading advertisement to enable them to obtain sales leads. The false advertisement was specifically designed to lead defendants to credulous buyers. The record attests to defendants’ success in this respect. Section 421 of the Penal Law does not require a showing that anyone has been cheated or defrauded by the false advertising—it merely requires a showing that the defendants have been guilty of false advertising. So, in People v. Richter’s Jewelers (291 N. Y. 161), we-upheld a conviction under section 421 upon a mere showing that defendant had *472 displayed a diamond ring with a tag attached stating, “ 1 Ct. Perfect Diamond ”, when the fact was that it was an inferior smaller stone. An inspector of weights and measures detected the falsity in the advertisement. Defendants’ claim was that the tag was intended for a perfect, one-carat diamond, and that it was attached by innocent mistake to an inferior smaller stone. In rejecting that defense we said (pp. 165-166): “ The Court of Special Sessions might have accepted the explanation if it had chosen. It was not bound to do so. In any event, though innocent error might render the offense venial, a statement of fact which is untrue, deceptive, or misleading, placed upon a tag ‘ with intent to sell or in any wise dispose of merchandise ’ constitutes a violation of section 421 of the Penal Law even when the statement is made without 1 actual evil design or contrivance to perpetrate fraud or injury upon others.’ The statutory offense is committed by ‘ material misrepresentations intended to influence the bargain ’ though at times such misrepresentations may be due to lack of care rather than to dishonesty. (People v. Federated Radio Corp., 244 N. Y. 33, 39, 41).”
From the foregoing it will be seen that “ the statute before the court for construction was designed to prevent deceptive, careless or negligent conduct resulting in misrepresentation and to protect the credulous against themselves. A construction which achieves that purpose is in accord with the ‘ fair import ’ of its terms, is designed ‘ to promote justice and effect the objects of the law ’ and does harm only to the wrongdoer who either intentionally or carelessly puts out for public consumption deceptive, misleading or untrue advertising or other printed material. (People v. Reilly, 255 App. Div. 109, affd. 280 N. Y. 509.) ” (People v. Kelly, 204 Misc. 145, 148.)
The rule of morality recognized by this construction of section 421 can hardly be deemed too rigid for respectable merchants. To borrow language from Chancellor Walworth in People v. Haynes (14 Wend. 546, 560): “ Neither do * * * [we] believe any honest man will be in danger of becoming a tenant of the state prison, if the statute against * * * [false advertising], is carried into full effect * * *. But it may indeed limit and restrain the fraudulent speculations and acts of some, whose principles of moral honesty are regulated solely by the denunciations of the penal code.”
*473 Defendants argue that an addition to the General Business Law enacted two days prior to the affirmance herein by the Appellate Division proves that the Legislature intended section 421 of the Penal Law to be inapplicable in a situation where the advertiser does not intend to sell the item advertised. This contention is predicated upon new section 396 of the General Business Law (L. 1958, ch. 849), which authorizes the Attorney-General to bring a civil action for an injunction where it appears that a person advertises merchandise with the intent, design or purpose (a) not to sell the merchandise so advertised at the price stated in the advertisement or (b) not to sell the merchandise so advertised. However, the enactment of section 396 does not militate against the view that defendants’ conduct violated the provisions of section 421 of the Penal Law. By the enactment of section 396 of the General Business Law, the Legislature merely gave to the Attorney-General the right to seek a civil injunction against certain acts which are criminal. This is not without precedent. The false advertising of securities comes within the ban of section 421 of the Penal Law. Nevertheless, the Attorney-General is authorized by the Martin Act (General Business Law, art. 23-A) to seek a civil injunction against untrue and misleading advertisements made with the intent to sell securities (People v. Federated Radio Corp., 244 N. Y. 33).
Defendants rely upon the Governor’s 1958 Message to the Legislature as indicating that section 421 does not cover their acts. In such message the Governor wrote (N. Y. State Legis. Annual, 1958, p. 381): “ As various district attorneys have indicated publicly, the present Penal Law does not give them adequate authority to prosecute those who cheat consumers by means of vicious sales promotional practices. One such practice is bait advertising, where products are advertised for sale at a price at which the seller has no intention of selling. Another problem is that of fictitious bargain claims. I recommend legislation to provide adequate protection to the consumer against those evils, both through changes in the Penal Law and by the provision of new civil remedies.”
It would seem from the quoted message that the Governor’s objective was to urge the Legislature to increase the restriction on so-called “ bait advertising ”. Assuming, however, that the *474 message reveals that the Governor and “ various district attorneys ” were under the impression that section 421 was inapplicable to bait advertising, that impression may not influence our decision. In the ordinary situation where a court looks to an extrinsic aid to construction, such as a Governor’s memorandum, it does so to ascertain the purpose of legislation thereafter enacted. Here, defendants ask us to take the Governor’s memorandum into account in construing a statute enacted years before the memorandum was written. If we were to rely on the memorandum for such purpose, we would be investing the Governor with the power of construction properly belonging to the judicial branch of government. It goes without saying that the courts construe statutes, not the Governor, and certainly not the various District Attorneys within the State.
Finally, defendants call our attention to the fact that on the same day the Legislature enacted section 396 of the General Business Law it also amended section 421 of the Penal Law, but only to add the words “ or over any television channel” to the various media of communication covered by the statute. The argument is made that while thus amending section 421 of the Penal Law, and while also enacting section 396 of the General Business Law to provide for a civil injunctive remedy against advertising with an intent, scheme or purpose not to sell, the Legislature did not see fit to amend section 421 of the Penal Law further so as to include in the penal statute the same prohibition against an intent, scheme or purpose not to sell as contained in the nonpenal enactment. This, it is claimed, demonstrates that defendants’ conduct was never intended to be covered by section 421 of the Penal Law. The short answer to this argument is that the Legislature deemed it unnecessary to amend section 421 of the Penal Law to include the language employed in section 396 of the General Business Law for the reason that they concluded that the section adequately covered conduct such as defendants’. It must be borne in mind that defendants were not convicted of violating section 421 simply because they advertised items of merchandise which they never intended to sell. They were convicted because they falsely advertised ‘‘ with intent to sell * * * merchandise,” albeit not the precise items advertised.
*475 Defendants were charged, in the words of section 421, with placing false advertisements before the public “ over a radio station and in other ways ”, The proof shows that the advertisements were communicated to the public over a television channel. This conduct would clearly be encompassed by the broad language of the statute, to wit, “ in any other way ”. The amendment of section 421, after defendants’ conviction, to specifically include the phrase “ or over any television channel ” does not mean that advertising over a television channel prior to the amendment was not covered by the sweeping phrase * ‘ in any other way”. By the amendment the Legislature merely spelled out that which was previously set forth in general terms.
The final point to be considered is whether the Court of Special Sessions of the City of New York, Borough of Brooklyn, possessed jurisdiction to try defendants on the conspiracy count.
It is clear that except in connection with the commission of certain crimes, not here material, an overt act is an essential ingredient of the crime of conspiracy (Penal Law, § 583)., “ Whatever the relative weight of the unlawful agreement and of the overt act as necessary parts of the crime, the latter is a required element. Since no agreement to commit a crime amounts to a conspiracy unless some act be done to effect the object thereof, the crime is not complete until the doing of the overt act. Thus, the commission of the crime depends for its validity upon the overt act and the unlawful agreement or combination without the overt act is insufficient to constitute the crime.” (People v. Hines, 284 N. Y. 93, 112-113.)
The information here charges that 6 ‘ From, in and about the month of June, 1953, and continuously thereafter, to in or about the month of December, 1954, in the County of Kings, defendants wilfully, knowingly, unlawfully and corruptly conspired ”, etc. (emphasis supplied). Five overt acts are alleged in the information. The first four overt acts specified occurred outside of Kangs County. The first overt act specified occurred in Queens County and Newark, New J ersey. The second overt act specified occurred in Queens County since all bookkeeping entries were made there. The third and fourth overt acts specified would appear to have taken place in the defendants’ place of business in Queens County. The fifth and final overt act aEeged is that: “A salesman, agent or representative of said defendants, in *476 or about the month of July, 1954, in the County of Kings, told the customer that the sewing machine, as advertised by defendants over station WATV, was made of cast iron and was cheap, and advised said customer not to purchase said machine.”
Defendants argue that this fifth overt act cannot serve to confer jurisdiction to try them in Kings County since such act must necessarily have occurred after the conspiracy to commit false advertising had been completed. We do not agree. The conspiracy is alleged, and was proved, to have extended over the period of June, 1953 to December, 1954. It was thus a conspiracy of a continuing nature. The fifth overt act alleged in the information was proved to have occurred in September, 1954, during the period of the false advertising campaign.
Even if we accept defendants’ premise that the fifth overt act followed the false advertising in point of time, the proof of such overt act taking place in Kings County was sufficient to warrant a conviction in Kings County inasmuch as the overt act was done to effect the object of the conspiracy (Penal Law, § 583). The conspiracy necessarily involved dissuading customers from purchasing the $29.50 advertised machine.
The Appellate Division has offered a further sound reason for holding that an overt act in furtherance of the conspiracy was committed in Kings County. After stating that the broadcasts were relayed or rebroadcast from the Empire State Building in New York County and were heard in every county of the city, the Appellate Division wrote:
“ While the overt acts of broadcasting are not specifically labeled or described in the information as ‘ overt acts ’ in accordance with the literal requirements of section 398 of the Code of Criminal Procedure, nevertheless such overt acts are implicitly incorporated therein. The gravamen of the general conspiracy count is that appellants conspired to violate section 421 of the Penal Law, by disseminating untrue statements in advertisements ‘ over any radio station ’, with the intention of selling their sewing machine to the public, knowing and intending that such advertisements should be heard in Kings County. It may be said that here the ‘ requirement of section 398 * * * respecting the allegation of overt acts has been met, although quite ineptly. The use of the words “ overt acts ” is not indispensable, although they should be used. It is sufficient if overt *477 acts are in fact alleged ’ (People v. Scobie, 257 App. Div. 854, affd. 281 N. Y. 796; cf. Code Crim. Pro., § 284, subd. 7).
‘ ‘ In any event, the trial proceeded upon the basis of the overt acts broadcasting the advertisements containing the false assertions. Indeed, the trial revolved upon proof of such broadcasts as the foundation of the conspiracy count. Reading the information in its entirety, as we must, it is our opinion that appellants were sufficiently apprised of all the overt acts relied upon (including the broadcasting) to enable them, as they actually did, to prepare their defense to such acts. Hence, it is of no moment now, after the trial, that overt acts which are implicit in the general charge, and which have been proved without objection, were not specifically labeled as ‘ overt acts ’ in the information (cf. People v. Willis, 158 N. Y. 392, 397, 398; People v. McCarthy, 250 N. Y. 358, 363; People v. Scobie, 257 App. Div. 854, supra; cf. Code Crim. Pro., § 284, subd. 7).”
It is true that the overt acts of broadcasting and rebroadcasting the advertisements containing the false statements also constituted the substantive crime of false advertising under section 421 of the Penal Law. That is of no moment, however, for as the Appellate Division has said: “ While the overt act need not ‘ be of itself a criminal act ’ and need not ‘ constitute the very crime that is the object of the conspiracy ’ (United States v. Rabinowich, 238 U. S. 78, 86; People v. Tavormina, 257 N. Y. 84, 93), nevertheless it may well be, and frequently is, for the ‘ overt act is usually the commission of the substantive offense ’ (Weiss v. United States, 103 F. 2d 759).”
The judgments of conviction should be affirmed.

. So far as pertinent, section 396 provides that “ No person * * * shall * * * by any means of advertisement, or other means of communication, offer for sale any merchandise * * * as part of a plan or scheme with the intent, design or purpose not to sell the merchandise * * * so advertised