OPINION OF THE COURT
Meyer, J.
This appeal arises out of an action brought by plaintiff Hartford Accident and Indemnity Company for declaratory *221 judgment that it is not required either to defend or to pay any award of damages that may be made in an action brought by defendant Lawrence Critelli under the Civil Rights Act (US Code, tit 42, § 1983) against defendants Stephens and Russo, police officer employees of defendant Village of Hempstead. The claim in the Federal action was that Critelli had been injured when struck on the head, face and body by the officers’ nightsticks as they attempted to awaken him from "a drunken stupor” as a result of which Critelli lay sleeping on the grass alongside a public street. Although the Federal complaint alleged that Critelli had permanent scars and had incurred expenses for medical treatment as a result of the beating, its only monetary demand was for punitive damages of $100,000. Hartford disclaimed on the ground that the Critelli action sought only punitive damages which its policy[1] did not cover, and brought this action for judgment so declaring.
On motion and cross motion for summary judgment, Special Term held that the Federal action was not limited to punitive damages,[2] that Hartford’s obligation to defend is broader than its duty to pay and that, therefore, Hartford is required to defend the Federal action. Concerning any damage award that might be made in the Federal action, Special Term, construing the ambiguous wording of the policy against the insurer, held that the policy covered the action, but concluded on public policy grounds that Hartford could not be required to pay any award of punitive damage that might be made in that action.[3] The Appellate Division affirmed unanimously, without opinion (61 AD2d 893). On motion of defendants Stephens, Russo and the village, we granted leave to appeal (45 NY2d 711). We affirm.
Preliminarily we note that Hartford has not sought review by us of that part of Special Term’s order-judgment holding Hartford obligated to defend, that the instant action clearly is a presently justiciable controversy (Prashker v *222 United States Guar. Co., 1 NY2d 584, 591-592), and that, contrary to Hartford’s suggestion, the issues before us turn not on any affirmed findings of fact but solely on public policy and the interpretation of statutes, both of which are matters of law (Farrington v Pinckney, 1 NY2d 74, 82 [public policy]; People v Glubo, 5 NY2d 461, 474 [statute]).[4]
On the merits, defendants Stephens, Russo and the village argue that though public policy may proscribe insurance coverage of punitive damages for private insureds that rule should not be applied to a governmental employee who will be deterred from effective performance of his duty if he must bear the burden of punitive damages individually and who is subject to the sanction of dismissal by his governmental employer for any acts that could result in the imposition of punitive damages. They suggest also that sections 50-j[5] and 52 of the General Municipal Law evidence a contrary legislative policy since those sections mandate that police officers be indemnified for tort liability and authorize the purchase of liability insurance covering such employees. Hartford urges, to the contrary, that the statutes referred to are inapplicable because not enacted until over two years after issuance of its policy and after the incident for which Critelli sued, and, further, that the deterrence purpose of punitive damages would be defeated if liability insurance is held to cover such damages.
Before discussing the issues thus raised, we comment on the significance of the fact that the Federal action was brought under the Civil Rights Act. In the first place, the fact *223 that that action names only Stephens and Russo as defendants must be regarded as historical accident, for Monroe v Pape (365 US 167), which held that a section 1983 action could not be brought against a municipality, and which was the governing authority when Critelli’s action was brought, has now been overruled by Monell v New York City Dept. of Social Servs. (436 US 658). However, the fact that the village is not a party defendant in the action makes it unnecessary for us to decide whether, as some authorities have held or suggested,[6] there is a different public policy concerning insurance coverage for vicarious liability for punitive damages than for direct liability. Secondly, whether punitive damages are allowable in a 1983 action is a matter of Federal, rather than State law. The Supreme Court did not find it necessary to decide that issue on the facts of Carey v Piphus (435 US 247). Without expressing either approval or disapproval, it cited (435 US, at p 257, n 11) a number of Circuit Court decisions holding that in a section 1983 action such damages may be awarded for the purpose of "deterring or punishing violations of constitutional rights”,[7] but also noted that the section has a criminal counterpart (US Code, tit 18, § 242) and that since passage of the Civil Rights Attorney’s Fees Award Act of 1976 (US Code, tit 42, § 1988) a defendant in a section 1983 action has a potential liability for attorney’s fees which "provides additional — and by no means inconsequential — assurance that agents of the State will not deliberately ignore due process rights”. Since punitive damages are claimed in the Critelli action and there is no Federal authority holding that such damages cannot be awarded in a 1983 action, we must conclude, nothwithstanding the absence of a ruling by the Supreme Court, that the punitive damage issue will be presented to the Federal jury before which the Critelli action is finally tried.
Thirdly, while the construction of Hartford’s insurance policy issued in New York is governed by State, rather than Federal, law, it is proper for us in determining what New York’s public policy requires or permits with respect to insurance coverage of punitive damages, to consider the legislative *224 policy behind the Civil Rights Act.[8] In that respect Carey v Piphus (supra) is once again instructive, for it details that the Congress that enacted section 1983 intended to create a tort liability (435 US, at p 253), but did not address the issue of damages (id., at p 255) and that, to the extent Congress intended by enactment of the section to deter the deprivation of constitutional rights, "there is no evidence that it meant to establish a deterrent more formidable than that inherent in the award of compensatory damages” (id., at pp 256-257).[9] Of interest also is the court’s characterization of punitive damages in Electrical Workers v Foust (442 US 42, 48) as " 'not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence’ ” (quoting from Gertz v Robert Welch, Inc., 418 US 323, 350), for that characterization read together with the Piphus decision, and particularly its footnote 11, suggests that if the Supreme Court ultimately holds that punitive damages may be recovered in Civil Rights Act actions, the purpose for doing so will be punishment and deterrence and not compensation.
With that background, we consider, first, the effect on the issues before us of the 1975 and 1976 amendments to the General Municipal Law that became subdivision 1 of section 50-j and section 52 of that law, and then what New York’s public policy is with respect to insurance coverage of punitive damages.
Subdivision 1 of section 50-j requires the village to save harmless "any duly appointed police officer * * * for any negligent act or tort, provided such police officer, at the time of the negligent act or tort complained of, was acting in the performance of his duties and within the scope of his employment” and section 52 authorizes a village to "purchase liability insurance with such limits as it may deem reasonable for the purpose of protecting its officers and employees against liability for claims arising from their acts while exercising or performing or in good faith purporting to exercise or perform their powers and duties.” These statutory provisions do not affect the public policy determination we are required to *225 make. While public policy is generally determined by the Legislature (Messersmith v American Fid. Co., 232 NY 161, 163), and our determination of public policy (as distinct from the interpretation of the insurance policy)[10] is limited by the statutes existing at the time that issue is decided (I. L. F. Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 270, app dsmd 369 US 795), we do not find anything in- the wording of the statutes, and the parties have not pointed to anything in the legislative history of either of them, to indicate with sufficient clarity to govern the insurance question before us the existence of a legislative policy. The issue is not directly addressed by either provision, and if it be assumed, without deciding, that the general indemnification provision of subdivision 1 of section 50-j is broad enough to include indemnity for punitive damages, it is, nonetheless, true that the more specific liability insurance provision of section 52 contains "good faith” language suggesting that the Legislature did riot contemplate insurance against punitive damages.[11] Our conclusion is that the public policy question must be decided without reference to these two statutory provisions.
No New York case has dealt directly with the public policy issue in relation to an insurance policy issued to a governmental agency. Two New York cases, Padavan v Clemente (43 AD2d 729) and Teska v Atlantic Nat. Ins. Co. (59 Misc 2d 615), have held that since punitive damages are imposed not as compensation but as punishment and as a deterrent, the policy behind their imposition would be defeated were an individual insured permitted to avoid the burden of such damages by passing it on to an insurance carrier. In a related inquiry, whether an insurance policy covers a willful injury, *226 this court in Messersmith v American Fid. Co. (232 NY 161, 165, supra)[12] has indicated that coverage would be barred by the "fundamental principle that no one shall be permitted to take advantage of his own wrong”. Outside New York, a New Jersey court has applied the Padavan-Teska reasoning to a city and its police officers sued in a section 1983 action for unlawful arrest, assault and battery and malicious prosecution, and concluded, without spelling out its reasoning, that public policy would "not permit a defense or indemnification by the carrier of any claim for punitive damages” (City of Newark v Hartford Acc. & Ind. Co., 134 NJ Super 537, 547; see, also, City Council of City of Elizabeth v Fumero, 143 NJ Super 275). No other case dealing with the governmental aspect of the question has been found.
Most of the case law and legal writing discussing insurance coverage of punitive damages has dealt with nongovernmental insureds, but the considerations they discuss are pertinent to our inquiry. To analyze and discuss all of those cases and articles would unduly extend this opinion. Rather those materials will be listed in the margin[13] and their public policy discussions summarized.
The strongest arguments against coverage are that it defeats the purpose of punitive damages, which is to punish and to deter others from acting similarly, and that allowing coverage serves no useful purpose since such damages are a windfall for the plaintiff who, by hypothesis, has been made whole by the award of compensatory damages. To allow coverage, it *227 is said, passes on to other premium payers the punishment intended for the defendant, creates a conflict of interest between insurer and insured, and a conflict between the rule permitting the jury to consider defendant’s financial standing in fixing the amount of punitive damages and the rule against revealing insurance coverage to the jury. With respect to municipal employee defendants, it is argued further, that the existence of the Civil Rights Act and of the Civil Rights Attorney’s Fees Award Act makes it clear that coverage is not necessary as an incentive to the bringing of an action (cf. Electrical Workers v Foust, 442 US 42, 48, supra).
The arguments for allowing coverage are that the number of instances in which punitive damages are awarded shows that they are not really a deterrent, that coverage does not eliminate deterrence in any event because of the cost of such insurance and of the possibility of added premium loading for any insured for whom a carrier is required to pay punitive damages, that the policy language is broad enough to cover both compensatory and punitive damages[14] and would be so interpreted by the average policyholder, that public policy should not be held partially to void the policy, particularly since small businesses can be wiped out by such an award, and that even those courts which do hold that public policy proscribes coverage do not void coverage of punitive damages payable by defendants held liable only vicariously. With respect to municipal employee defendants, in particular to police officers, the argument runs, not to allow coverage is to deter such employees from taking actions clearly in the interest of the municipality and of society and to affect adversely, at least in the case of large punitive damage awards,[15] the financial stability of already hard-pressed governmental units.
Of importance in determining what public policy dictates in the instant case is the fact that punitive damages are awarded not for the unintended result of an intentional act, but for the conscious disregard of the rights of others or for conduct so reckless as to amount to such disregard (North *228 western Nat. Cas. Co. v McNulty, 307 F2d 432, 442; see 1 NY PJI 2:278 and Comment). Bearing that fact in mind, we conclude that the rule to be applied with respect to a punitive damage award made in a Civil Rights Act action[16] is that coverage is proscribed as a matter of public policy. We reach that conclusion primarily because to allow insurance coverage is totally to defeat the purpose of punitive damages, but a number of other factors are also involved. Not the least of these is that most of the arguments for coverage (e.g., that punitive damages are not a deterrent) essentially address not whether there should be coverage but whether there should be punitive damages at all. As to the premium loading suggestion, it is simply irrelevant since if public policy proscribes coverage it does so whether an additional premium is paid or not. With respect to municipal employee defendants the chilling effect argument cannot be given very much weight[17] in view of the existence of criminal sanctions and the right to recover attorneys’ fees under Federal law,[18] and while those factors may suggest that the additional deterrent of punitive damages is not required (or even desirable) that is a matter of Federal Civil Rights Act law, not State insurance law. The contention that a large punitive damage award may affect the financial stability of the employee or the municipality is, we believe, largely exaggerated since each can show his or its lack of wealth[19] (see Zarcone v Perry, 572 F2d 52, 56; Rupert v Sellers, 48 AD2d 265, 272; Admissibility On Defendant’s Behalf, As Matter in Mitigation of Punitive Damages, Of Evidence As To His Lack of Financial Resources, Ann., 79 ALR3d 1138), each is entitled, notwithstanding suggestions of divided loyalty, to defense of the punitive damage issue by an attor *229 ney selected by the employee or the municipality but paid for by the carrier (Prashker v United States Guar. Co., 1 NY2d 584, 593, supra), and since the reasonableness of the amount assessed against each as punitive damages is subject to judicial review (Zarcone v Perry, 572 F2d 52, supra; Walker v Sheldon, 10 NY2d 401, 405; Faulk v Aware, Inc., 19 AD2d 464, affd 14 NY2d 899). The conclusion we reach, it is worthy of noting, accords with the majority view as to nongovernmental insureds and, of course, is subject to legislative revision as to governmental or nongovernmental insureds or both should the Legislature, addressing its attention more specifically to the problem of insurance coverage of punitive damages, conclude that the rule should be otherwise.
For the foregoing reasons, we would affirm the order of the Appellate Division, with costs.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order affirmed.

. The policy was issued to the village, but Hartford has not questioned that it also covers defendants Stephens and Russo.

. As Special Term noted, rule 54 (c) of the Federal Rules of Civil Procedure (in US Code, tit 28, Appendix) permits a plaintiff to recover damages pleaded and proved even though not demanded in his prayer for relief.

. Special Term also held that Hartford was not estopped from denying liability for punitive damages. Since appellants have not briefed or argued that issue we do not consider it (see, however, Northwestern Nat. Cas. Co. v McNulty, 307 F2d 432, 442-443; American Sur. Co. of N. Y. v Gold, 375 F2d 523, 528, both holding that what public policy proscribes estoppel cannot require).

. Though its decision did not expressly pass upon whether the policy language was broad enough to cover punitive as well as compensatory damages, Special Term impliedly so held for the public policy issue need have been reached only if the policy could be interpreted to cover such damages. Construction of the policy would, in any event, involve no issue of fact, the conclusion turning on whether one emphasizes the words "bodily injury” (and thus excludes punitive damages), or the words "all sums” (and thus includes such damages) in the policy clause requiring the carrier to pay "all sums which the insured shall become legally obligated to pay as damages because of bodily injury” (see Kendrigan, Public Policy’s Prohibition Against Insurance Coverage for Punitive Damages, 36 Ins Counsel J 622; and Gonsoulin, Is An Award of Punitive Damages Covered Under An Automobile or Comprehensive Liability Policy?, 22 Southwestern LJ 433). Thus, the issue would, in any event, be one of law (Hartford Acc. & Ind. Co. v Wesolowski, 33 NY2d 169, 172). We do not reach the question, however, since the parties have argued only questions of public policy and statutory application.

. Reference is to the section 50-j relating to police officers. The General Municipal Law contains another provision, also designated 50-j, relating to correction employees.

. (E.g., Northwestern Nat. Cas. Co. v McNulty, 307 F2d 432, supra; Lo Rocco v New Jersey Mfrs. Ind. Ins. Co., 82 NJ Super 323; Esmond v Liscio, 209 Pa Super Ct 200; Ohio Cas. Ins. Co. v Welfare Fin. Co., 75 F2d 58, cert den 295 US 734.)

. For additional such cases see Annotation: Punitive Damages in Actions for Violations of Federal Civil Rights Act (14 ALR Fed 608).

. Compare the Annotation cited in footnote 7 (14 ALR Fed 608, 618).

. Indeed, the California Supreme Court has held, in Williams v Horvath (16 Cal 3d 834), that nothing in section 1983 precludes indemnification by the municipality of the Civil Rights Act liability of its employee.

. As we have held with respect to a statutory policy (and a fortiori, therefore, as to a negotiated policy) a modification of the statute "may not be imposed on the insurer until there is an opportunity to discontinue coverage” (Char-Mo Investors v Market Ins. Co., 44 NY2d 793, 795). Even if the question of interpretation of the policy were before us, therefore, we would not apply these 1975 and 1976 enactments in determining whether a policy issued June 1, 1972 for a term of three years covered punitive damages with respect to an incident which occurred on November 8, 1972. If the policy as written was not broad enough to encompass punitive damages coverage, these statutory provisions would not change that interpretation.

. Compare the correction employee statute (General Municipal Law, § 50-j) which expressly excludes violations of statute (subd 4) and specifically provides that the rights and obligations of an insurer are not impaired, limited or modified by the provision (subd 6). See, also, subdivision 2 of section 50-k of the General Municipal Law which is addressed to Civil Rights Act actions against police department members in cities of over one million population.

. (See, also, Liability Insurance: Specific Exclusion of Liability for Injury Intentionally Caused by Insured, Ann., 2 ALR3d 1238; Liability Insurance as Covering Accident, Damage, or Injury Due to Wanton or Wilful Misconduct or Gross Negligence, Ann., 20 ALR3d 320.)

. The fullest exposition against coverage is that in Northwestern Nat. Cas. Co. v McNulty (307 F2d 432), and for coverage, that in Lazenby v Universal Underwriters Ins. Co. (214 Tenn 639), First Nat. Bank v Fidelity & Deposit Co. (283 Md 228) and Harrell v Travelers Indemnity Co. (279 Ore 199). Additional cases are listed in the First Nat. Bank opinion and can be found through the annotation entitled Liability Insurance Coverage as Extending to Liability for Punitive or Exemplary Damages (20 ALR3d 343). A long list of law review articles will be found in footnote 11 to the McNulty decision, to which should be added the Kendrigan and Gonsoulin articles cited in footnote 4 and Hall, The Validity of Insurance Coverage for Punitive Damages — An Unresolved Question? (4 N Mex L Rev 65); Lambert, Does Liability Insurance Cover Punitive Damages, (1966 Ins LJ 75); Lentz, Payment of Punitive Damages by Insurance Companies (15 Clev-Mar L Rev 313); Obler, Insurance For Punitive Damages: A Reevaluation (28 Hastings LJ 431); Zuger, Insurance Coverage of Punitive Damages (53 ND L Rev 239); as well as Comments or Notes (63 Col L Rev 944; 20 SC L Rev 71; 39 Temple LQ 459; 46 Va L Rev 1036).

. (See n 4 above.)

. [4] Punitive damages need bear no ratio to compensatory damages (Toomey v Farley, 2 NY2d 71). In Reynolds v Pegler (123 F Supp 36, affd 223 F2d 429, cert den 350 US 846) a verdict of $1 compensatory and $175,000 punitive damages was upheld and in recent times a California jury has returned a punitive damage verdict of $128.5 million against the Ford Motor Co. (Time, Feb. 20, 1978, p 65).

. While in the main the considerations on which we base that conclusion also apply to actions of other types, we believe the better course, particularly because of the interweaving of Federal and State law involved in the present decision, is to reserve decision in such other cases until a specific case or cases can be dealt with.

. That is not to say, however, that in considering whether the amount assessed as punitive damages is excessive, the chilling effect should not be considered (see Afro-American Pub. Co. v Jaffe, 366 F2d 649, 662).

. A Civil Rights Act plaintiff is not automatically entitled to both punitive damages and attorneys’ fees. For the governing criteria see Zarcone v Perry (681 F2d 1039, cert den 439 US 1072).

. [5] The employee would also be entitled to separate his own financial resources from those of the municipality by requesting a charge that the jury must fix a separate punitive damage verdict as to each defendant (see Raplee v City of Corning, 6 AD2d 230, 233; cf. Zarcone v Perry, 572 F2d 52, 53; and New York Times Co. v Sullivan, 376 US 254).