**John O'NEILL, Plaintiff,**

v.

**YIELD HOUSE INC. and Standex International Corporation, Defendants.**

**YIELD HOUSE, INC., Third–Party Plaintiff,**

v.

**CRAFTWOOD PLUS, INC., Third–Party Defendant.**

No. 91 Civ. 2051 (BDP).

United States District Court, S.D. New York.

May 8, 1997.

Henry R. Simon, White Plains, NY, for plaintiff.

Stephen R. Morello, Garcia & Stallone, Melville, NY, for defendants.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

This products liability action was tried from November 10 to November 22, 1994. The jury returned a verdict against defendant Yield House, Inc., awarding plaintiff John O'Neill compensatory and punitive damages. At the time of the trial, Yield House was insolvent and had filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. § 110 *et seq.* (1993).

On September 20, 1995, O'Neill moved, pursuant to Fed. R. Civ. P. 69(a), for a writ of execution against St. Paul Fire and Marine Insurance Co. ("St.Paul"), Yield House's insurance carrier, in connection with its attempts to recover the damages awarded by the jury. Thereafter, St. Paul issued drafts to cover compensatory damages and costs, but not punitive damages.

On September 9, 1995, this Court, applying New York choice of law principles, denied plaintiff's motion on the ground that New York's public policy prohibited indemnification for punitive damage awards. Our Court of Appeals subsequently vacated the September 9, 1995 order and remanded the matter to receive evidence and make findings on the nature and status of Yield House's insolvency and to consider the motion in light of that new evidence. *O'Neill v. Yield House Inc.*, No. 95–9008, slip op. 1, 1996 WL 576003 (2d Cir. Oct. 8, 1996).

## FACTS

On May 19, 1990, John O'Neill fractured his tibial plateau when a stepstool he had purchased through a Yield House catalogue collapsed from underneath him. The catalogue had described the product as "ruggedly built" and "solidly made." As a result of the accident, O'Neill was hospitalized for several months and sustained permanent injuries.

After a trial before a jury, on February 28, 1995, judgment was entered in favor of plaintiff in the amount of $460,750—$210,750 in compensatory damages and $250,000 in punitive damages.

In February 1995, plaintiff John O'Neill died, and on April 27, 1995, plaintiff's son, Shane O'Neill was appointed Administrator of the estate of John O'Neill. On April 1, 1997, the Court granted plaintiff's unopposed motion to substitute Shane O'Neill.

On September 20, 1995, Shane O'Neill moved for a writ of execution, pursuant to Fed.R.Civ.P. 69(a), against St. Paul for the recovery of damages awarded in the underlying personal injury action. St. Paul had sold to Yield House a general liability protection insurance policy ("the policy"), effective March 16, 1990 to March 16, 1991. The policy obligated St. Paul to indemnify Yield House for sums that it might become legally obligated to pay as a result of claims arising from Yield House's negligence. The policy did not explicitly exclude coverage for punitive damages. It did, however, exclude coverage for intentional bodily injury or property damage. St. Paul is a Minnesota corporation, with its principal place of business in St. Paul, Minnesota. Yield House was a New Hampshire corporation with its principal place of business in North Conway, New Hampshire. The insurance policy was negotiated by a New Hampshire broker and was delivered in New Hampshire.[1]

In assessing whether the policy covered punitive damages, this Court, in connection with plaintiff's application, found that New York's choice of law principles required application of New York's public policy which

---

precludes the indemnification of punitive damages. *See, e.g., Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 613, 642 N.E.2d 1065, 1069 (1994). As previously noted, plaintiff appealed, and the Court of Appeals remanded, instructing this Court to receive evidence relating to Yield House's insolvency and to reconsider the motion in light of that evidence.

On April 1, 1997, the Court heard oral argument on the matter during which additional facts were adduced. In February 1991, before the trial but after the action was commenced, Yield House filed for bankruptcy pursuant to Chapter 11. In January 1992, Yield House filed a Second Amended Plan of Reorganization which contemplated a reorganization of the company and a sale of its assets. Pursuant to the reorganization plan, Yield House sold substantially all of its assets and ceased operations. In July 1992, Yield House was discharged from bankruptcy. According to Mark J. Friedman, Esq., who served as bankruptcy counsel to Yield House during the Chapter 11 proceedings, no assets remain in the bankruptcy estate and Yield House has no assets from which to satisfy the punitive damages award.

## DISCUSSION

▮ The threshold question is what law applies. St. Paul urges that New York law should apply, while plaintiff maintains that New Hampshire law governs. The difference between the law of these two states is of considerable significance because New York law clearly precludes indemnification for punitive damages, *see Zurich,* 618 N.Y.S.2d at 613, 642 N.E.2d at 1069, whereas New Hampshire law apparently permits such indemnification. *See American Home Assurance Co. v. Fish,* 122 N.H. 711, 451 A.2d 358, 360 (1982); *see also Weeks v. St. Paul Fire & Marine Ins. Co.,* 140 N.H. 641, 673 A.2d 772, 775 (1996) ("Even assuming, without deciding that the claims are penal, we have held an insurance company liable for exemplary or punitive damages where fines and penalties

are not expressly excluded by the policy language.").

▮ Sitting in diversity, this Court applies the choice of law rules of the forum state—New York. *Bader v. Purdom,* 841 F.2d 38, 39 (2d Cir.1988); *Fireman's Fund Ins. Co. v. Schuster Films, Inc.,* 811 F.Supp. 978, 982 (S.D.N.Y.1993); *Avondale Indus., Inc. v. Travelers Indem. Co.,* 774 F.Supp. 1416, 1423 (S.D.N.Y.1991). In contract cases,[2] New York courts apply the "grouping of contacts" test to determine the applicable law. *See Zurich,* 618 N.Y.S.2d at 612, 642 N.E.2d at 1068; *Fireman's Fund,* 811 F.Supp. 978.

▮ When applying the grouping of contacts test, New York courts have looked principally to the following factors: (1) the place of contracting, (2) the place of negotiation and performance, (3) the location of the subject matter of the contract, and (4) the domicile or place of business of the contracting parties. *Zurich,* 618 N.Y.S.2d at 612, 642 N.E.2d at 1068 (citing Restatement [Second] of Conflict of Laws § 188[2] [hereinafter Restatement] ); *see Fireman's Fund,* 811 F.Supp. at 984 (citing *Olin Corp. v. Ins. Co. of North America,* 743 F.Supp. 1044, 1049 (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir. 1991)).

▮ In addition, New York courts, in the "special subset of contracts that involves insurance, will apply the local law of the state which the parties understood was to be the principal location of the insured risk ... unless with respect to the particular issue, some other state has a more significant relationship under the principles states in § 6 [of the Restatement] to the transactions and the parties." *Zurich,* 618 N.Y.S.2d at 614, 642 N.E.2d at 1070 (internal quotations omitted); *In re Payroll Express Corp.,* 921 F.Supp. 1121, 1125 (S.D.N.Y.1996); *see* Restatement § 193.

---

**2.** Although the underlying personal injury action sounded in tort, the question of whether, under the policy, St. Paul is obligated to indemnify plaintiff is clearly a one of contract interpretation. Accordingly, the grouping of contacts test,

rather than alternative tests that might be used in tort actions, applies. *See In re Allstate Ins. Co.,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 908, 613 N.E.2d 936, 940 (1993); *see, e.g., Zurich,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065.

■ The Restatement concludes that the location of the insured risk is given overriding consideration in determining the applicable law where the risk is essentially restricted to a single state. The location of the risk will have less significance, however, "(1) where the insured object will be more or less constantly on the move from state to state during the term of the policy and (2) where the policy covers a group of risks that are scattered throughout two or more states." Restatement § 193 cmt. b.

■ Yield House operated a catalogue sales business involving the sale and distribution of merchandise in a number of states.[3] Thus, it cannot be said that there was one principal location of the risk. Injuries arising from Yield House's merchandise could potentially have occurred in any state in which a customer purchased or used the merchandise. Accordingly, the location of the risk does not weigh heavily in this choice of law analysis.

Returning to the original *Zurich* factors, the balance after the grouping of contacts tilts sharply towards New Hampshire law. The place of contracting, the place of negotiation, and Yield House's principal place of business are all in New Hampshire and New York had no involvement with those contacts. Likewise, the subject matter of these policies—the promise of indemnification—favors the application of New Hampshire law.

As noted above, because of the nature of catalogue sales, injury could occur in a number of different states. New York courts have held in analogous cases that "policies covering contracts throughout the country or the world, delivered to insured in particular states should be covered by the laws of those states." *Fireman's Fund*, 811 F.Supp. at 985 (citing *Regional Import & Export Trucking Co. v. North River Ins. Co.*, 149 A.D.2d 361, 539 N.Y.S.2d 940, 941 (1st Dep't 1989)). This principle can comfortably be applied here because Yield House was a New Hampshire company and the policy was negotiated and delivered there. Since Yield House, when securing insurance from St. Paul, could not anticipate the place of injury, applying the law of the situs of the injury, rather than New Hampshire law, would undermine the principles of certainty, predictability, and ease of determination that underlie choice of law jurisprudence. *See* Restatement § 6(2)(f), 6(2)(g).

■ Even when applying the grouping of contacts test, however, in certain instances "the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests, and therefore should be considered." *Zurich*, 618 N.Y.S.2d at 613, 642 N.E.2d at 1069.[4] The rationale underlying New York's strong policy against indemnification for punitive damages is that

> it defeats the purpose of punitive damages, which is to punish and to deter others from acting similarly, and that allowing coverage serves no useful purpose since such damages are a windfall of the plaintiff who, by hypothesis, has been made whole by the award of compensatory damages. To allow coverage, it is said, passes on to other premium payers the punishment intended for the defendant, creates a conflict of interest between insurers and insured, and a conflict between the rule permitting the jury to consider defendant's financial standing in fixing the amount of punitive damages and the rule against revealing insurance coverage to the jury.

*Hartford Accident & Indemnity, Co. v. Village of Hempstead*, 48 N.Y.2d 218, 422 N.Y.S.2d 47, 53, 397 N.E.2d 737, 743 (1979).

Because no New York court has specifically addressed how the policy choices emphasized in *Zurich* relate to foreign bankrupt corporations "it falls to this Court to predict how the New York Court of Appeals would interpret New York law on this point."

---

3. Although it is not clear from the record the precise geographic breadth of Yield House's customer base, it is clear that Yield House did business through catalogue sales in several states, including New York.

4. The New York Court of Appeals has noted that a "foreign State's sufficiently compelling public policy could preclude an application of New York law otherwise indicated by the grouping of contacts analysis, particularly where New York's policy is weak or uncertain." *Zurich*, 618 N.Y.S.2d at 613, 642 N.E.2d at 1069.

*Frank Felix Assoc., Ltd. v. Austin Drugs Inc.,* 111 F.3d 284, 287–88 (2d Cir.1997); *See Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261 (2d Cir.1997); *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531 (2d Cir.1997).[5]

Where, as here, the judgment debtor is insolvent, the retributive purpose of New York's public policy will not be advanced since the absence of assets means that Yield House will experience none of the intended effects of punitive damages. Even where assets remain, the judgment creditor will, as a practical matter, find himself standing in line with other creditors. If any assets are available for distribution, any punitive impact on the debtor would still be sharply reduced. Meanwhile, permitting the award to constitute a claim against the estate might have the unintended negative consequence of unfairly reducing distributions to innocent creditors.

Likewise, the deterrent purposes—general and specific—of punitive damages would not be advanced where the defendant is insolvent. Underlying New York's policy is the presumption that leaving punitive damage awards uninsurable inspires a higher level of care and encourages a higher degree of concern for safety among manufacturers. This component of New York's policy, however, will not be advanced where the debtor is bankrupt because other manufacturers and the general public will see no additional costs imposed on the grossly careless manufacturer because of the intervening bankruptcy. Specific deterrence will not be advanced because a manufacturer making choices about the level of care to bring to an enterprise is unlikely to spend time calculating whether, in the event of a future bankruptcy, a punitive damage award would be recovered from the estate, the insurer, or at all. *See* Janet Malloy Link, Note, "When a Sting is Overkill: An Argument for the Discharge of Punitive Damages," 94 Colum. L.Rev. 2724, 2741 (1994).

Accordingly, this Court concludes that, since the public policy objectives of New York law will not be advanced by precluding indemnification where the defendant is insolvent, that public policy cannot be said to be "sufficiently compelling" to preclude the application of New Hampshire law. *See Zurich,* 618 N.Y.S.2d at 613, 642 N.E.2d at 1069. Plaintiff's motion for a writ of execution pursuant to Fed.R.Civ.P. 69(a) is granted.

**SO ORDERED.**

---

**5.** This Court's analysis is confined to the relationship between New York law and a foreign corporate defendant with no assets. Different policy considerations might apply, and different conclusions reached, where the insolvency involves, for example, an individual or a corporate entity successfully able to propose a plan of reorganization. *See generally* 11 U.S.C. § 109.