Francis J. Bloustein, J.
The Attorney-General of the State of New York instituted this proceeding on behalf of the People of the State for an injunction pursuant to subdivision 12 of section 63 of the Executive Law and subdivision 1 of section 396 of the General Business Law to restrain the respondents from engaging in certain unlawful and fraudulent business practices involving “ bait advertising ”. All 23 respondents named in the petition, with the exception of J. Michaels Inc., Jules D. Michaels, Robert Michaels, and J. Michaels Stores Corp. (hereinafter called Michaels Group), consented to the entry of judgment restraining them from engaging in such practices (hereafter referred to as consenting respondents) or have defaulted in answering. Only the Michaels Group resisted this proceeding; it entered a general denial and stood trial.
The parties have submitted the case to the court on an agreed statement of facts. The only substantial issues involved in the proceeding are those of law. The first and most important of these is whether a well-known retail business concern which licenses the use of its name to another is responsible for the *154 deceptive, misrepresentative and fraudulent practices of its licensee, even though it lacks knowledge of those practices. The second question which is raised is whether an injunction may issue under subdivision 12 of section 63 of the Executive Law, or subdivision 1 of section 396 of the General Business Law against a business firm which has already desisted from the prohibited activity at the time the proceeding commences.
The pertinent provision of the Executive Law prohibits “ repeated fraudulent or illegal acts ” and “ persistent fraud or illegality in the carrying on, conducting or transaction of business ’ ’. The relevant section of the General Business Law provides: “ 1. No person, firm, partnership, association, or corporation, or agent or employee thereof, shall, in any manner, or by any means of advertisement, or other means of commmunication, offer for sale any merchandise, commodity, or service, as part of a plan or scheme with the intent, design, or purpose not to sell the merchandise, commodity, or service so advertised at the price stated therein, or with the intent, design or purpose not to sell the merchandise, commodity, or service so advertised.” Both the Executive Law and the General Business Law empower the Attorney-General to 'apply for an injunction restraining the continuance of the proscribed business practices.
Paragraphs 39 and 40 of the petition generally state the gravamen of the complaint against the respondents.
‘ ‘ 39. That said members of the consuming public were falsely and fraudulently led to believe, by virtue of a mass advertising campaign, utilizing the media of radio, the newspapers or other means of communication, that they were dealing directly with a well known reputable department store of long standing.
“ 40. That from 1964 a scheme and plan to defraud the public was formed and carried out by the respondent by means of ‘ bait advertising ’ in radio, newspapers and other means of communication to offer for sale home improvements, merchandise, commodities or services, as part of their plan or scheme with the intent, design or purpose of not selling said home improvements, merchandise, commodities or services so advertised at the price stated therein or with the intent, design or purpose of not selling the home improvements, merchandise, commodities or services so advertised.”
It is alleged that the respondents engaged in a scheme, plan and artifice to repeatedly defraud home owners and the general public in the State of New York by means of deception, concealment and unconscionable contractual provisions contained in contracts made with home owners upon fraudulent representations and promises that were never intended to be kept.
*155 Typical of the hait advertising is a transcript of a broadcast script used by the respondents over the air on April 9,1966, which is contained in the footnote herein.*
The respondents in the Michaels Group have operated a well-known and reputable department store for some 75 years under their own name. In 1958, they bought the remaining assets — including the good will, business name and style — of 0. Ludwig Baumann, an old established and responsible furniture chain store, which, it is alleged, bore an excellent reputation, and they thereafter operated one of their stores as the C. Ludwig Baumann Division of J. Michaels, Inc., and otherwise used the 0. Ludwig Baumann name in the conduct of their business.
On February 11,1966, the Michaels Group entered into a contract with Harvey Associates, Inc. (a consenting respondent in this proceeding) under the terms of which Harvey Associates was given the right to ‘ ‘ operate a department for the sale of Home Improvements” and to “ use * * * the name of 0. Ludwig Baumann Co.” in consideration of payment of $400 a month to the Michaels Group. Actually, the operation of the so-called “ department for the sale of Home Improvements ” entailed no more than the use of the Baumann name to advertise home improvements; there was no other connection between the contracting parties.
Moreover, it turned out that, without the Michaels Group’s knowledge, Harvey Associates subcontracted the operation of different phases of the C. Ludwig Baumann Home Improvement Department to a number of subcontractors, all of whom are consenting respondents herein. All of these subcontractors operated from sites outside and independent of any branch or store owned, operated or managed by the Michaels Group.
By an agreement made on February 15, 1966 following its agreement with the Michaels Group, Harvey Associates subcon *156 tracted the use of the name C. Ludwig Baumann for a consideration of $500 a month to another of the respondents.
One of the consenting respondent subcontractors was engaged in the aluminum siding business, another in patio construction, still another in playroom conversion and others in similar ‘ ‘ home improvement” activities. The fraudulent scheme of operation of all the subcontractors was similar and is adequately reflected in the agreed-upon statement submitted at the trial concerning the activities of the Armstrong Aluminum Co., another consenting respondent herein.
Armstrong entered into an agreement with a group of advertisers and public relations people (all of whom are consenting respondents herein) to purchase at $45 each the names of “ leads ”, persons who had responded to the “ bait ” carried in radio and newspaper ads prepared by the advertisers. A lead is a prospect, a name and address of a home owner in need of or interested in improving his home. These advertisements epitomize what is the worst in contemporary advertising and are so painfully familiar that it is unnecessary to reproduce more than the one already set forth in the footnote. Combining the techniques of repetition, emphasis and exaggeration, they prey in unconscionable fashion on the ignorant and the gullible and appeal to the universal urge for a bargain.
The “ bargain ” or “ bait ”, the ads involved in this proceeding held out, was that, “ for a limited time only ”, a householder could have his “ whole house, a giant 1,200 square feet ” re-sided (with aluminum) for an unbelievably cheap price of $349. It was suggested that the true value of the siding being offered was $2,000 to $3,000. The credibility of the offer was established by making skillful allusion to the fact that the offer came from “ Famous C. Ludwig Baumann, with over 90 years of department store reliability ”. All one had to do was “ call Murray TTill 7-9000 ”; “no money down ”; low weekly payments and you might even get “ a new TV set with your siding. Lucky you ”.
Those who were “ lucky ” enough to respond to these masterful exercises in the manipulation of human cupidity, soon found themselves confronted with an Armstrong salesman; the “ bait ” having been taken, the cleverly trained salesman came to pull in the fish. The sales technique was a simple one; the advertised product, the “ great bargain ” which had induced the customer to invite the salesman into his home, was roundly denounced and denigrated; dented, ‘ ‘ beat up ’ ’ samples of the siding were exhibited and materials and workmanship were disparaged and downgraded. The skilled salesman then induced the unwary customer *157 to “ switch ” to another effective and satisfactory product, one which carried a price tag, however, of anywhere from 8 to 10 times more than was originally advertised. Thus, one “widow ” earning $66 a week as a domestic, was induced to abandon the originally advertised aluminum siding at a price of $349 and purchase siding for $3,500, which when financed over an 84-month period would cost her $5,500.
The evidence shows that there was no instance in which a contract was made which conformed to the advertising offer. Moreover, there was testimony that performance at the offered price would have represented a very substantial loss to the subcontractor. It is plain and uncontroverted that Armstrong and the other respondent subcontractors never intended to sell at the advertised price and that their business operations ran afoul of both subdivision 12 of section 63 of the Executive Law and subdivision 1 of section 396 of the General Business Law.
The issue posed in this proceeding, however, is not whether fraud and deceit within the meaning of these statutes is made out, but rather whether the Michaels Group, the only respondents who went to trial, can be held responsible for the complained-of practices. Its only involvement in the “bait advertising” scheme was its original contract with Harvey Associates, in which it licensed the use of the C. Ludwig Baumann name and a subsequent certification of the contractual arrangement, which was made to one of the respondent advertisers upon its request. It had neither any reason to suspect nor any actual knowledge of the fraudulent scheme and in fact, the scheme was perpetrated in violation of its agreement with Harvey Associates, which forbade any sublicensing or use of the name by others, as actually took place. The Michaels Group urges that under these circumstances, it cannot be held responsible. It is pertinent to consider that the Michaels Group in its agreement of February 11, 1966 with Harvey Associates prohibited the use to Harvey Associates of ‘ ‘ the credit of J. Michaels, Inc. and/or C. Ludwig Baumann & Co., in connection with its purchases from suppliers, or to in any way indicate that it is so affiliated with J. Michaels, Inc. and/or C. Ludwig Baumann & Co. as will encourage suppliers to furnish merchandise on the basis of the credit of J. Michaels, Inc. and/or C. Ludwig Baumann and Co.”. In the same agreement, Harvey Associates agreed to indemnify J. Michaels, Inc., or C. Ludwig Baumann & Co. and to “ hold them harmless of and from any liability for or by reason of any and all claims for injury to persons and damage to property caused by the acts or omissions of Harvey, its agents * * * or incidental to their operation ”.
*158 The significance of these provisions should not be overlooked. The Michaels Group, although they disclaim any liability to those of the public who might be defrauded by the complained-of improper practices, took all legal steps and precautions to protect itself against any practices that Harvey, its agents, servants, employees, etc., might undertake which would be prejudicial or harmful to them. This insistence on the part of Michaels Group for protection indicated an awareness that the practices on the part of Harvey Associates under the executed agreement might be improper or unlawful.
To allow a wall of ignorance to provide legal immunity to a well-known retailer, who allows his good name to be used by others, would be to defeat the salutary purposes of our statutes enacted to protect the public against “ bait advertising ” and other such fraudulent business practices. A vital element of the ‘ ‘ bait advertising ’ ’ prohibited by our statutes is the use of a trade name which will lend respectability and credibility to the ‘ ‘ bait ’ ’. The well-known trade name invites and induces the public to enter into the scheme; it lends credence to the offer of the “ bargain it promotes false assurance in the public that the offer is as legitimate as the name which stands behind it.
This being so, any reputable business firm is under an obligation to allow its name to be used only where it takes active steps to prevent the misuse of its name for the purposes of fraud and deceit (cf. People v. Photocolor Corp., 156 Misc. 47). The wrong made out against the Michaels Group was not that they knowingly entered into the fraud, which involved the use of the C. Ludwig Baumann name, but rather that they failed to take any precautions against the misuse of that name. Since the legitimate business name is an essential element of the ‘ ‘ bait advertising ’ ’ scheme, one who gives another use of such a name is in effect putting a potent instrument of fraud into another’s hands. It would run contrary to the public policy involved in protecting consumers against fraud to condone the practice of licensing use of a business or trade name without undertaking care to guard against its misuse of such business or trade name in the sale of products.
One who reaps profits from the use of his good name should bear the burden of preventing its misuse to the detriment of the public. I hold the Michaels Group responsible for the fraudulent business practices of the other respondents involved herein because they put into their hands the means making possible the deception and fraud here practiced and because they failed to exercise reasonable supervision of the use of the C. Ludwig *159 Baumann name. At no time did Michaels Group make an endeavor to police or supervise the use of the name licensed to Harvey Associates. They took no steps to check on Harvey with whom they contracted concerning the use to which the C, Ludwig Baumann name was being put.
A duty rests on every entrepreneur to so conduct himself as not to deceive the consuming public or to be guilty directly or indirectly of exploitation, misrepresentation or fraud in sales. It is not enough for such entrepreneur — whether an individual, partnership or corporation — to say that they were unaware of what was taking place. They are charged with knowledge of the natural consequences of their acts. Upon all the conceded facts, it is clear that the respondents in this matter, who have not consented to the restraining order, should have been aware of the fact that the name C. Ludwig Baumann was being used by those respondents, who were preying upon the public in this nefarious scheme known as “bait” and “switch”. Else why was a consideration being paid for the use of such name?
It appears to the court that the principals of C. Ludwig Baumann, who entered into the agreement with Harvey Associates, Inc., were constructively aware that the name was being used and it might be used improperly. They cannot raise this wall of ignorance to avoid the obligations that rest upon them.
Only within the past three weeks, the President of the United States in a special message to the Congress proposed a number of measures for legislative action to afford consumer protection (New York Times, Feb. 7, 1968, pp. 1, 31). Heading the list of the items reported in the press was: ‘ ‘ Crack down on fraud and deception in sales ”.
The efforts of the Better Business Bureau in calling the offending practices to the attention of the Attorney-General and the latter’s prompt action and proceedings pursuant to the authority of the Executive Law and the General Business Law are commendable in their aid to the public.
Turning to the second ground of defense put forward by the Michaels Group, I find it also unavailing. It is true that the Michaels Group took prompt steps to terminate their agreement with Harvey Associates as soon as they were informed of the fraudulent scheme by which the consumers were deceived. It is also true that the complained-of licensing arrangement was terminated by the time this proceeding was initiated. This does not mean, however, that no purpose will be served by issuing an injunction against the Michaels Group in this case. In the opinion of the court a permanent injunction will serve as a deterrent *160 not only to the nonconsenting respondents in this proceeding, but to all those who may be inclined to prey upon a gullible and unwary public.
Although the Michaels Group was prepared to and did terminate its arrangement with Harvey Associates, Inc., once evidence of business fraud was brought to its attention, it would not and does not now admit an obligation to prevent such fraud from occurring by actively undertaking to police any licensing arrangement involving the use of its name. Thus, although this court is assured that the Michaels Group will not knowingly enter into an arrangement for the use of its name for fraudulent purposes, it has no assurance that it will actively undertake to prevent any such misuse of its name if it once again licenses its use. The purpose of the injunction in this case is to impose that obligation on the respondent Michaels Group. Let the injunction issue.

 “ Attention Home Owners. How would you like to end painting forever? How would you like to save 30% on fuel bills —• Save thousands on outside repair maintenance * * * Aluminum, the wonder metal is used on modem skyscrapers and modern buildings. How much would you expect to spend for expensive aluminum siding * * * $3,000-$2,000.
“ For a limited time only famous C. Ludwig Bauman, with over 90 years of department store reliability will re-side your whole house, a giant 1,200 square feet, in your choice of 127 color combinations for only $349 — I said only $349 —
“ Aluminum is waterproof, fireproof, ice, rot, and insect proof. No money down for six months. Then $2.30 weekly. It’s unbelievable only $349. Call Murray Hill 7-9000 . . . Mu. 7-9000. Want a new TV" set with your siding? Lucky you. Call Murray Hill 7-9000 ... Mu. 7-9000. In New Jersey call Mitehel 3-3322 . . . Mi. 3-3322 . . . Mu 7-9000 or Mi 3-3322. Connecticut, Long "Island and out of town call collect ”.