OPINION OF THE COURT
Harry W. Davis, J.
Defendants were convicted by a jury of the crime of scheme *250 to defraud in the first degree (Penal Law, § 190.65). That section reads as follows: "1. A person is guilty of a scheme to defraud in the first degree when he (a) engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons or to obtain property from ten or more persons by false or fraudulent pretences, representations or promises, and (b) so obtains property from one or more of such persons. 2. In any prosecution under this section, it shall be necessary to prove the identity of at least one person from whom the defendant so obtained property, but it shall not be necessary to prove the identity of any other intended victim.”
Each defendant now moves to set aside the verdict.
During 1977 the New York Times in its "Business Opportunities” under its "Financing and Business Loans” columns, carried an advertisement for "Business Loans to start, expand, combine bills, Venture Capital from Five Thousand to Five Billion”. With this advertisement appeared a telephone number. A call to that number reached defendant F. Augusto Ford (hereinafter Ford) as well as his codefendant and (now estranged) wife, Lynne Ford (hereinafter Ms. Ford) at an office located at 342 Madison Avenue in New York County. There is no evidence that either one or both of the defendants or that the trade name was the tenant or lessee. Nor is there evidence of any filed certificate for the trade name "Venture Capital”. Those who did call that number and who eventually became victims, were told to come to the office after they had explained their respective needs and purposes. Each was of course told that he or she could be helped with a loan.
The victims who testified, were largely persons without capital or business experience and were seeking money to start small businesses of their own. Many had been turned down by traditional credit sources and they then scanned the columns of the New York Times as a last resort. Applicants were told that they could obtain the sought after financing in return for a flat fee and a percentage of the loans obtained.
In the agreements appearing in this case the victim was required to give defendant Ford a sum of money which was intended for his services in helping to procure the loan or which was to be applied towards a payment to be due defendant Ford, if and when he procured the loan. Where the victim was a member of a racial minority, Ford would emphasize that these groups were victims of lies and that it was "his *251 mission” to overcome these disadvantages through his "contacts”. Where the victim revealed a belief in God or religion, Ford spoke of his own religious "ministry”. Ford told his victims that he was "a private [nonpublic] individual engaged in diversified confidential services to world-clients.” He also represented that he was "in partnership with other financiers, lenders and investors, who, when taken together, constitute a private, confidential merchant banking system.” The victims were required to supply Ford with varying types of personal and financial data.
There was of course no guarantee that any loan would be obtained and in no instance did any person known to the People ever receive a loan. One of the victims, Joseph Kemp, gave Ford $2,600 in checks, in advance for the expected services.
People’s witnesses testified that they had answered the advertisement in the newspaper and that business meetings were arranged over the phone; that, at these meetings, Ford was always present and that Ms. Ford was sometimes present. That Ford made representations that he expected that he would be able to obtain loans for the prospective borrowers and in at least one instance stated that he would return the fee if he was unable to obtain the requested loan (the loan was not obtained, and the payment not returned). All papers, contracts and receipts were signed by Ford; all checks were payable to Ford and these as well as cash payments were given to him. The witnesses believed that they were doing business only with Ford and it was their expectation that he was the person who would be contacting the potential lenders. Dealings with Ms. Ford had been of a social or clerical nature and most of the witnesses believed that Ms. Ford was merely a secretary. There were occasions when Ms. Ford would work with some victims by helping them correct flaws in their business proposals, but after correcting the proposal, Ms. Ford’s job was finished. Ms. Ford’s only apparent contacts with "Venture Capital” consisted of depositing checks in the bank, typing, answering the telephone, arranging appointments for Ford, and giving status reports on Ford’s attempts to obtain a loan for the victim. There is testimony that Ms. Ford told some of the victims that she was very experienced in rewriting successful proposals, that she had her own lenders, that she set the rates which Ford charged, and that Ford was able to get loans and therefore, was worthy of trust. On one *252 occasion there was a check issued to Ford which he indorsed and delivered to Ms. Ford which bears her signature.
Finally, numerous documents were admitted into evidence. On some documents the letterhead was that of "Diversified Financing” with Dr. F. Augusto Ford listed as president and Rev. Lynne Ford as vice-president. Other documents had only "Dr. F. Augusto Ford, Financial Consultant” as a letterhead. The testimony indicated that Ford used the letterheads interchangeably. No witness relied upon Ms. Ford’s name appearing on the letterhead.
As stated, in no instance did any person known to the People obtain anything in the form of loans nor did Ford return any of the money which had been given to him by the victims. The time period over which these transactions occurred and repeated representations made, was from in and about January of 1977 to, in and about July of 1978.
The scheme to defraud statutes were added to the Penal Law by chapter 384 of the Laws of 1976. They became effective January 1, 1977. No case law regarding these offenses has been called to my attention and my own investigation has disclosed none. This may very well be the first case tried under this statute. We are told in "Additional Commentary” (Givens, Additional Commentary, McKinney’s Cons Laws of NY, Book 39, 1979-1980 Pocket Part, Penal Law, § 190.60, p 79, scheme to defraud, second degree) that these sections "parallel the mail fraud statute” and "Like the mail fraud statute [the sections] make the nefarious character of the scheme * * * the essence of the crime.” Additionally "As under the federal cases, fraud would appear to include disregard to the trust of representations made to the victim.” (Givens, Additional Commentary, McKinney’s Cons Laws of NY, Book 39, 1979-1980 Pocket Part, Penal Law, § 190.60, p 80. )
The newspaper advertisements in the New York Times were obviously designed to attract 10 or more persons into the defendant’s office. The representations and promises made were obviously designed to prompt the victims to give their money to Ford and the victims did in fact give their money to him in reliance upon these representations and promises. During the trial the People proved the identity of at least one victim, Joseph Kemp. Many other witnesses testified to similar facts regarding the circumstances surrounding their own experiences with Ford.
*253 The "intent to defraud” called for in the statute could only be and was in fact proved solely by circumstantial evidence. "The oft-stated rule with respect to convictions based exclusively upon circumstantial evidence is that for guilt to be proven beyond a reasonable doubt the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them; and the facts proved, must exclude 'to a moral certainty’ every reasonable hypothesis of innocence.” (People v Benzinger, 36 NY2d 29, 32.)
I am not unmindful of the fact that all issues are for the trier of the facts and that the jury’s verdict of guilty indicates that the circumstantial evidence has been resolved in favor of the People. However "the foundation for the findings must be facts and inferences that are so reasonable that they cannot be confused with mere conjecture or suspicion.” (People v Castillo, 47 NY2d 270, 277.)
The jury had the right to and did obviously take into consideration all of the conduct acted out by the defendants in front of the victims. Ford was of course the movant in the representations to all of them. He was the one who painted the gilded pictures and who acted as the great financier in asking them to submit various types of business proposals so that there was an indication that the proposed borrower intended a legitimate business purpose. He also sought and obtained financial statements from them in the manner of lending institutions. Nevertheless there did appear in the testimony, certain actions by Ford which when taken together with his manner of gathering the data were more than sufficient for a jury to find a lack of caring if loans would or would not ever be made once he received his fees. It was abundantly apparent that care for the victims’ needs was not Ford’s strong suit. It has been said: "Where a party never intended to live up to the contract or engages in other conduct with the specific intention of cheating the other party to the transaction, then and only then does a scheme to defraud exist.” (Givens, McKinney’s Cons Laws of NY, Additional Commentary, Book 39, 1979-1980 Pocket Part, Penal Law, § 190.60, p 82.) Each case taken separately might indeed lead to a different result but collectively only one finding could reasonably be found: It was a scheme to defraud!
Putting all the facts together as well as the patterns of each case in its totality, the finding of guilty as to defendant Ford *254 did "exclude to a moral certainty every reasonable hypothesis of innocence.” As to him therefore the motion is denied.
As regards the other defendant Ms. Ford, the conclusion is less than irresistible. While the evidence against her can be viewed as being consistent with guilt, it does not necessarily exclude "to a moral certainty” every other reasonable hypothesis. It is true that she worked in the same office with Ford and though she was his wife at the time, there is no proof beyond a reasonable doubt that she knew that he was engaged in a scheme to defraud. Certainly the jury must have found her to be acting in concert with him, but her limited actions and dealings with the victims were entirely consistent with those of an innocent administrative assistant or office secretary. Her duties encompassed typing, answering the telephone, arranging business appointments for the victims with Ford, reviewing and revising business proposals made by the victims, giving status reports regarding loan applications, and setting the fees for his services. All of these jobs are of a clerical nature and could have been pursuant to his instructions. Certainly there is no evidence to the contrary.
Although she was present at some of the meetings, she never participated in any of the business discussions between Ford and his victims. The dealings with Ms. Ford were only of a social or clerical nature. Ford used a letterhead which contained Ms. Ford’s name interchangeably with a letterhead which only contained his name. None of the witnesses produced by the People claimed to have relied on the use of her name on a letterhead. Most of the victims stated that they believed that she was just a secretary. She never signed any papers, contracts or receipts and no payments were made to her except that Ford did give her one check which he first indorsed. This could have been for any reason — even to purchase food for the marital abode. Perhaps Ford fooled Ms. Ford in the same manner and to the same extent that he fooled his victims. Certainly there is no evidence either way. If she had not been married to him and had in fact been hired only as a secretary, with all other things being equal, she would, beyond cavil, probably not even have been indicted.
Considering the facts proved and the inferences reasonably to be drawn therefrom, the jury was not justified in concluding beyond a reasonable doubt that Ms. Ford was guilty of a scheme to defraud. In this case, the People have established the circumstances, but the inferences to be drawn therefrom *255 are sufficient only to create suspicion. Proof of her guilt has not been established to a moral certainty, nor is the evidence as a whole inconsistent with her innocence. As the court said in People v Razezicz (206 NY 249, 273): "Circumstantial evidence in a criminal case is of no value if the circumstances are consistent with either the hypothesis of innocence, or the hypothesis of guilt; nor is it enough that the hypothesis of guilt will account for all the facts proven.”
"The mass of testimony presented to the jury includes very many facts that are consistent with the defendant’s guilt. They arouse one’s curiosity and suspicion, but do not convince the judgment.” (People v Razezicz, supra, p 271.)
Accordingly the motion as to her is granted.