OPINION OF THE COURT
Donald J. Mark, J.
This prosecution was apparently one of the first[1] in the history of this State for the crime of scheme to defraud, first degree, in violation of subdivision 1 of section 190.65 of the Penal Law.
The defendant corporation was also charged with the crime of false advertising in violation of section 190.20 of the Penal Law.
At the conclusion of the nonjury trial,[2] decision was reserved.
Although the proof as to both crimes was interwoven, the elements of each are not identical. Section 190.65 was designed to prevent consumer fraud and is akin to larceny by false pretenses (Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law 190.65, p 83, 1979-1980 Pocket Part), while section 190.20 does not require a showing that anyone has been defrauded by the false advertising (People v Glubo, 5 NY2d 461). Under the Federal mail fraud statute section 1341 of title 18 of the United States Code from which section 190.65 is derived (Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, *760 Penal Law 190.65, p 83, 1979-1980 Pocket Part), it was held that a scheme to attract customers to a store by false advertising, with a view to selling them unadvertised merchandise, was not a scheme to defraud in violation of that statute (Rude v United States, 74 F2d 673).
Since in the sequence of events depicted by the evidence produced, the alleged false advertising preceded the alleged scheme to defraud, these two charges will be discussed in inverse order.
Section 190.20 of the Penal Law, insofar as it is applicable to this case, provides as follows: "A person is guilty of false advertising when, with intent to promote the sale or to increase the consumption of property or services, he makes or causes to be made a false or misleading statement in any advertisement”.
The following evidence was adduced by the prosecution to demonstrate the alleged fraudulent advertising perpetrated by the defendant corporation.
The defendant corporation was engaged in the business of selling retail bulk beef, which it advertised at unusually low prices in the local newspapers. Each customer who responded to the advertisement, regardless of what meat he indicated an interest in, was first shown the sale beef which was fatty, discolored, and unappetizing. An employee would disparage the sale beef by advising the customer that the loss of fat and bone would make such a purchase unprofitable. After so discouraging the customer, the employee would show the customer much more appetizing meat at a higher price, but represent that there would be minimal loss from the pretrimmed beef and that it would last for a certain period of time. Except in one instance, each customer was persuaded to purchase the more expensive beef.
Most customers never complained to the defendant corporation and became available to the prosecution only after a local television channel exposed the alleged fraudulent practices. Most customers were generally satisfied with the quality of the meat purchased. Most customers had never seen a side of beef before and made a voluntary decision to purchase the pretrimmed beef after viewing the sale beef and being informed of its prospective waste. The sale beef was always available for purchase, and each customer expected that he would pay for some loss. All advertisements in small print *761 stated the loss of beef to be between 20% and 40% but such caveat was not observed by any consumer.
From June 1, 1978, until March 31, 1979, the defendant corporation consistently advertised the sale of beef at a price per pound that was less than the price for which it purchased such meat and at a price that was less than two other retail bulk meat businesses were selling the meat for. For example, in June, 1978, the defendant advertised bulk beef for sale at $.89 per pound at the same time it was purchasing such meat at $.94 per pound and at the same time the two said businesses were selling the same at an average of $1.27 per pound; and in March, 1979 the defendant advertised bulk beef for sale at various prices from $.89 per pound to $1.09 per pound at the same time it was purchasing such meat at $1.09 per pound and the same time the two businesses were selling the same at an average of $1.44 per pound.
The various employees of the defendant corporation quoted the loss of sale beef from a minimum of 30% to a maximum of 90% to 21 customers. The average of the percentage of loss so quoted was 54%. The same employees represented the waste of pretrimmed beef to 12 customers from a low of 0% to a high of lcKi2%, the percentage most frequently mentioned being 10%.
As a result of the actions of the defendant corporation’s employees, out of a total of 31 customers, 29 customers ultimately purchased the pretrimmed beef; one customer could not be dissuaded from buying the sale beef and one imposter had no intention of making any purchase.
Section 190.20 of the Penal Law may be construed in conjunction with section 396 of the General Business Law (People v Glubo, 5 NY2d 461, supra). The latter section gave the Attorney-General the right to seek a civil injunction against false advertising (Electrolux Corp. v Val-Worth, Inc., 6 NY2d 556). Both statutes proscribe the sale promotional practice known as "bait and switch advertising”, "bait advertising” or "fictitious bargain claims” (see Matter of People v Baumann & Co., 56 Misc 2d 153). This practice consists of advertising a product at a very low price; a pattern of conduct discouraging the purchase of the advertised article by disparaging the same and exhibiting a poor appearing specimen of the advertised article; and the resulting switch to the purchase of a product costing more than the one advertised (Electrolux Corp. v Val-Worth, Inc., supra; Matter of People v *762 Baumann & Co., supra; Matter of People v Levinson, 23 Misc 2d 483).
This is the exact factual predicate in the instant case, as it was in People v Glubo (supra).
In that case, the defendant advertised via television a sewing machine which cost it $45, for the price of $29.50. A customer who responded was visited by a salesman who would undertake to prove the advertised machine inoperable and point out that it was basically defective and inferior. The salesman would then attempt to persuade the customer to order a better machine at a much higher price. The defendant claimed that it intended only to discourage the sale of the advertised machine and that it always intended to sell the product where the customer could not be switched. Very few of the advertised machines were sold compared to the volume of the better and higher-priced machines.
The question of the true capacities and qualities of the $29.50 machine was not litigated. The sole claim of falsity was that the defendant had no intention whatever of selling the advertised machine for sale. The People’s case rested on the fact that the defendant advertised for sale a sewing machine it did not intend to sell in order to obtain leads so that it might sell the higher-priced machine. The defendant made no false representation concerning the machines they did sell and the sewing machines sold by the defendants were worth the money paid therefor.
The Court of Appeals held that the conduct of the defendant constituted false advertising and that it was properly convicted of violating former section 421 of the Penal Law, the predecessor of section 190.20.
Accordingly, the defendant corporation is found guilty of the crime of false advertising in violation of section 190.20 of the Penal Law.
The charge that the defendant corporation committed the crime of scheme to defraud, first degree, will now be considered.
Subdivision 1 of section 190.65 of the Penal Law provides as follows: "A person is guilty of a scheme to defraud in the first degree when he (a) engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons or to obtain property from ten or more persons *763 by false or fraudulent pretenses, representations or promises, and (b) so obtains property from one or more of such persons.”
The following evidence was produced by the prosecution to demonstrate that the conduct of the defendant corporation violated this section.
Although the employees of the defendant corporation estimated the loss of the pretrimmed beef from a low of 0% to a high of 10/12%, the actual weight loss of such meat purchased by 17 customers ranged from a low of 20% to a high of 40%. Included in these percentages is a 72% loss sustained by one customer,[3] and two percentages of 4% and 6% loss, all three of which were not considered representative.[4] The average of the percentage of waste which occurred in the 17 purchases was 31%.
A formula was devised by the court to show the relationship between the cost per pound of the sale beef based upon the percentage of loss stated by the employee of the defendant corporation and the cost per pound of the pretrimmed beef based upon the percentage of loss represented and the actual percentage of loss.
Nine out of 12 customers purchased the pretrimmed beef at a higher cost per pound than they could have purchased the sale beef despite the claims of the defendant corporation’s employees to the contrary. The highest price paid was $8.20 per pound[5] and the lowest price paid was $1.20 per pound. The average cost per pound of the pretrimeed beef was $3.39 while the average price per pound of sale beef would have been $2.27.
Nine customes who were informed their pretrimmed beef would last them for certain periods consumed such meat in less than the estimated interval. The highest overestimate was given to a customer who was told 308 pounds of meat would last 14/15 months, but which in fact was depleted in four *764 months. The customer whose overestimate was the least purchased 408 pounds of pretrimmed beef and that meat was used up in approximately 10 months while estimated to last for 12/14 months. The average time the beef was estimated to last was 11 months, while the average time the same actually lasted was 5 months.
Since Federal case law acknowledges that the mail fraud statute incorporates the common-law elements of fraud (Moore v United States, 2 F2d 839, cert den sub nom. Patt v United States, 267 US 598; United States v Bane, 433 F Supp 1286), and as has already been indicated, subdivision 1 of section 190.65 of the Penal Law is generally encompassed within the crime of larceny by false pretenses and resembles the Federal mail fraud statute, reference may be had to both to interpret this new section.
Under New York law, to constitute the crime of larceny by false pretenses, it must be established that there was a criminal intent to deprive an owner of his property, that the defendant made a false representation of an existing fact, that he knew such representation was false when made, that he obtained property as a result, that the person to whom the representation was made relied upon that representation and that such person was induced thereby to give his property to the defendant (People v Soto, 76 Misc 2d 491; see People v Kirkup, 4 NY2d 209; People v Gross, 51 AD2d 191, for examples of larceny by false pretenses).
The Federal mail fraud statute includes any scheme to obtain money from another by false pretenses under circumstances where, but for the false pretenses, money would not have been parted with (Moore v United States, supra). A scheme to defraud consists of a pattern of behavior calculated to deceive persons of ordinary prudence and comprehension (United States v Pearlstein, 576 F2d 531; United States v Netterville, 553 F2d 903, cert den 434 US 1009; United States v Bush, 522 F2d 641, cert den 424 US 977, reh den 425 US 986).
Under section 1341 of title 18 of the United States Code a scheme to defraud involves some connotation of planning and pattern (United States v Fuel, 583 F2d 978; United States v Nance, 502 F2d 615, cert den 420 US 926; Fabian v United States, 358 F2d 187, cert den 385 US 821). Defrauding of different people over extended period, using different means and representations may constitute a scheme and it makes no *765 difference that various deceptions are practiced (Owens v United States, 221 F2d 351; United States v Wernes, 157 F2d 797). Where utterances were repeated for a period of 18 months, they were continuous enough to be a scheme (United States v Dilliard, 101 F2d 829, cert den 306 US 635). The making of the same misrepresentations by many salesmen tend to prove a scheme’s existence (Reistroffer v United States, 258 F2d 379, cert den 358 US 927).
The fact that the employees of the defendant corporation over a period of nine months induced 29 customers to purchase pretrimmed meat by representing the waste percentage of the sale beef at various high percentages, by misrepresenting the estimated loss of the pretrimmed beef at various low percentages, by erroneously informing customers that they could save money by purchasing pretrimmed beef and by overestimating the length of time the pretrimmed beef would last, indicates that the defendant was engaged in a scheme to defraud.
The Federal mail fraud statute requires proof of specific criminal intent (United States v Bryza, 522 F2d 414, cert den 426 US 912; United States v Foshee, 569 F2d 401, on reh 578 F2d 629; United States v Payne, 474 F2d 603). This was not a case where direct evidence of the defendant corporation’s fraud was available through the testimony of former employees, partners or associates (see, e.g., United States v Armantrout, 411 F2d 60; United States v Zovluck, 274 F Supp 385, affd 448 F2d 339). However, a violation of this statute may be proved by circumstantial evidence (Windsor v United States, 384 F2d 535), and fraudulent intent may be inferred from all the facts and circumstances (United States v Fuel, 583 F2d 978, supra), from the modus operandi (United States v Reid, 533 F2d 1255), from the dealings between the parties (United States v Seasholtz, 435 F2d 4; Gusow v United States, 347 F2d 755, cert den 382 US 906) and from the losses sustained by the victims (United States v Regent Off. Supply Co., 421 F2d 1174).
There was proof in this case that on 21 occasions the employees of the defendant corporation represented the loss of the sale beef at various high percentages, that on 10 occasions they estimated the loss of the pretrimmed beef at various low percentages, that 15 customers purchased pretrimmed meat that had a substantial percentage of loss, that 9 customers paid a higher price per pound for pretrimmed beef than they *766 would have for sale beef and that 9 customers consumed the pretrimmed beef purchased in less time that the same was estimated to last. The circumstantial evidence is sufficient to permit the inference that the defendant corporation had the requisite criminal intent.
The misrepresentation under the Federal mail fraud statute must be directed to the quality, adequacy or price of the goods sold, and the deceit must affect a material part of the bargain in a manner in which it would affect the customer’s understanding or his assessment of its value to him (United States v Regent Off. Supply Co., supra). So where purchasers were led to believe that they were paying $600 for 600 rolls of film and were receiving photographic equipment free, and they were in fact paying $600 for approximately $280 worth of equipment because the cost of the film was hidden in the inflated cost of processing, the defendant was properly convicted under this section (United States v Hannigan, 303 F Supp 750).
Here it is quite obvious that the misrepresentations of the employees of the defendant corporation as to the percentage of loss of the pretrimmed beef, as to the price-saving feature of such meat and the length of time it would take to consume such beef were misrepresentations directed to the adequacy and the price of the pretrimmed beef and affected a material part of the bargain and the customer’s understanding of the value of this meat purchase to him.
Most Federal cases hold that section 1341 of title 18 of the United States Code encompasses representations made with a reckless indifference regarding their veracity (Gusow v United States, 347 F2d 755, supra; Babson v United States, 330 F2d 662, cert den 377 US 993). They treat a defendant who makes assertions with reckless disregard to their truth as if he had knowledge of their falsity (Irwin v United States, 338 F2d 770), and courts will infer willful intent from reckless representations (Elbel v United States, 364 F2d 127, cert den 385 US 1014). Even the defendant’s subjective intent is unimportant if his criminal culpability is based upon reckless indifference to the truth (Sparrow v United States, 402 F2d 826). Included in this category are half-truths (United States v Allen, 554 F2d 398, cert den 434 US 836) and statements implying knowledge when there is no knowledge, expressions of opinion when the speaker has no opinion in fact, and promises made without a reasonable basis that they can be *767 fulfilled (United States v Mackay, 491 F2d 616, cert den 416 US 972, on remand 374 F Supp 502, cert den 419 US 1047).
The evidence makes it apparent that at least the misrepresentations of the defendant corporation’s employees were made recklessly. There was no consistency to the percentage of loss of the pretrimmed meat actually sustained by the customers and no consistency to the predicted intervals such meat would last. Based upon the court’s formula no customer paid the same price per pound for the net amount of pretrimmed beef purchased and no customer would have paid the same price per pound for the net amount of sale beef he would have purchased.
The defendant corporation cannot defend upon the ground that the misrepresentations of its employees were mere seller’s talk (Harrison v United States; 200 F 662). The Federal courts have constructed two tests for distinguishing fraudulent misrepresentations from puffing.
Under the first test, a seller engages in a fraudulent misrepresentation when he actually invents nonexistent attributes (United States v New South Farm & Home Co., 241 US 64). False declarations of value constitute fraud because values are facts (United States v Rowe, 56 F2d 747, cert den 286 US 554; United States v Hannigan, 303 F Supp 750, supra). Under the second test, the purchaser is entitled to receive a product conforming to his expectation, and he is defrauded if his expectation is not met (United States v Whitmore, 97 F Supp 733). When a buyer receives a product not meeting the specifications represented (United States v Edwards, 458 F2d 875, cert den 409 US 891) or the value of the product is less then represented (United States v Bloom, 237 F2d 158), he has been defrauded.
The evidence presented in this case adequately demonstrates that the defendant corporation failed both tests. There were false representations of the value of the pretrimmed beef consistently made and many customers did not receive pretrimmed beef that conformed to their expectations based upon the misrepresentations of the defendant’s employees.
Based upon the above Federal case law, the defendant corporation has satisfied all the criteria required for the commission of the crime of a scheme to defraud. The defendant likewise has qualified on all the elements of the crime of larceny by false pretenses under the above State case law.
Accordingly, the defendant corporation is found guilty of *768 the crime of scheme to defraud, first degree, in violation of subdivision 1 of section 190.65 of the Penal Law.
This matter is adjourned until April 15, 1980, for sentence, and if appropriate, the probation department will conduct a presentence investigation.

. This trial was thought to be the first under section 190.65 of the Penal Law, but the day after this decision, the decision in People v Ford (103 Misc 2d 249) appeared in the New York Law Journal.

. The trial continued for three weeks. During the trial two video tapes were viewed and a bulk beef retail store was visited. There was testimony from 40 witnesses and 42 exhibits were received. The 40 witnesses included 31 customers, 2 meat experts and a New York State Police Investigator and a television photographer, both of whom posed as customers, among others.

. Ms. Hertel on redirect examination using a calculator computed that Customer 30 actually received 86 pounds of pretrimmed beef from a purchase of 308 pound by multiplying the amount of meat consumed each week by the number of weeks the meat lasted, and from that figure she computed the percentage of loss.

. The three percentages were used anyway, because the 72% loss favored the People and the 4% and 6% loss favored the defendant corporation and the use of the three percentages did not affect the outcome of this trial.

. This is Customer 30 again and the price per pound is abnormally high according to the court’s formula because the sale beef waste was estimated at 30% but the actual pretrimmed beef waste was 72%.