OPINION OF THE COURT
Bonnie G. Wittner, J.
Defendant William Koeppel is the owner and manager of several rent-stabilized apartment buildings in Manhattan. He is indicted for one count of rent gouging in the first degree (Penal Law § 180.57). That statute provides: "A person is guilty of rent gouging in the first degree when, in the course of a scheme constituting a systematic ongoing course of conduct in connection with the leasing, rental or use of three or more apartment units, the rental price of which is regulated pursuant to the provisions of federal, state or local law, he solicits, accepts or agrees to accept from one or more persons in three separate transactions some consideration of value, knowing that such consideration is in addition to [such] lawful rental and other lawful charges * * * and upon an agreement or understanding that the furnishing of such consideration will increase the possibility that any person may obtain or renew the lease, rental or use of such property, or that a failure to furnish it will decrease the possibility that any person may obtain or renew same, and thereby obtains such consideration from one or more persons” (emphasis supplied).
Defendant moves to dismiss the indictment based on, inter alia, legal insufficiency of the evidence and inadequate legal instructions. Because the Grand Jury heard evidence sufficient to support the indictment and because the prosecutor’s instructions were proper, the motion is denied.
THE EVIDENCE BEFORE THE GRAND JURY
The Grand Jury heard testimony from five tenants in buildings owned and managed by defendant. The jurors also heard from two real estate brokers, Chris Marr and Ted White, who attempted to place clients in defendant’s buildings. Both brokers and three tenants dealt directly with defendant. They all testified that Koeppel told them that a lease for a particular apartment could only be acquired if a substantial, specified donation (between $1,000 and $3,000 depending on the lease involved) was made to Republican political campaigns.
Christopher Marr testified that, in October 1990, he was employed as a real estate broker. He knew defendant as Bill *797 Koeppel, a principal in Koeppel and Koeppel, a company which owned and managed residential buildings in Manhattan. As a broker, Mr. Marr located apartments for clients, negotiated the leases and helped the client move into the particular property. His commission from the tenant was based on either the rent or the amount of work he did for the client. In October 1990, on behalf of a particular client, Mr. Marr submitted an application to Koeppel and Koeppel to rent an apartment at 250 East 73rd Street, New York, New York, a rent-stabilized building. Shortly after, Mr. Marr spoke to defendant by telephone to negotiate the details of the rental. Defendant told Mr. Marr that "in order to do this deal, I would have to pay Mr. Koeppel * * * wherever he would * * * instruct me to pay the money to.” (Grand Jury transcript, at 43.) Defendant said he was on a golf course with President Bush and that $2,000 of Mr. Marr’s commission on the apartment would have to be paid to the National Republican Committee in order for the client to obtain a lease. Mr. Marr told defendant he was shocked, was a Democrat and had never heard of a landlord asking for such a thing. After "several heated exchanges,” Mr. Marr and defendant arrived at a figure of $1,000 which had to be delivered by a certain date in order for Mr. Marr’s client to receive the apartment lease. (Grand Jury transcript, at 45.) Grand Jury exhibit 6 is a copy of Mr. Marr’s canceled check, dated October 4, 1990 and made out to The President’s Club.[1] The lease, at the maximum amount permitted by the rent stabilization regulations, was then executed at defendant’s office.
In early 1991, Mr. Marr negotiated on another client’s behalf for an apartment at 141 East 89th Street, a rent-stabilized building. Defendant again told Mr. Marr that his client could have the apartment only if Mr. Marr made a political contribution of $1,000. Mr. Marr made the contribution out of his $2,400 commission and the deal was consummated at defendant’s office for the maximum allowed monthly rental of $1,596.45.
A third client of Mr. Marr’s was interested in a rent-stabilized apartment at 141 East 89th Street. Mr. Marr learned about the apartment when he was telephoned by defendant sometime in the spring of 1992 and told that "a very below market value apartment [was] coming onto the market and *798 that I was to be given first shot at it before anyone else in the brokerage community” (Grand Jury transcript, at 51). Shortly after, in June of 1992, Mr. Marr submitted an application on behalf of his client for the apartment, and was once again told by defendant that a lease could only be obtained if he contributed $1,500 to a Republican political organization. Mr. Marr did so out of the proceeds of his commission and on June 12, 1992 the client executed a lease for the apartment at the regulated amount of $1,037.26.
In October 1992, Mia Sette, a tenant in 350 East 52nd Street, another rent-stabilized building owned and managed by defendant, learned of a larger apartment (12D) in the building. She called defendant’s office and was told by the office manager that she could have the apartment if she filled out an application. Exhibit 1 is the application, dated October 22, 1992, that Ms. Sette completed and left at defendant’s office. When a lease for the apartment was not forthcoming, Ms. Sette contacted Mr. Marr, through whom she had obtained her first apartment in the building. When he received Ms. Sette’s call, Mr. Marr was no longer working as a real estate broker. Nevertheless, since she was "a nice person,” he made a telephone call to defendant on her behalf. Mr. Koeppel told Mr. Marr that he knew Ms. Sette wanted the apartment and that the only way to obtain it was for a contribution of $2,000 to be made to the Giuliani election campaign. Mr. Marr explained that he was no longer in the brokerage business and was just trying to help Ms. Sette out. Defendant, however, insisted on the contribution as a condition of the lease. Mr. Marr informed Ms. Sette of this and negotiated the amount down to $1,725. Ms. Sette personally delivered to defendant money orders and a personal check made out to Giuliani for New York in that amount. She, her flaneé and Mr. Koeppel then executed the lease for apartment 12D at the maximum rent-regulated amount of $1,463.50 per month. Sometime later, Ms. Sette received two tickets to a campaign dinner for Mr. Giuliani.[2] Ms. Sette testified that she would "absolutely not” have contributed to the campaign had it not been a condition of obtaining the lease.
The Grand Jury also heard from a second real estate broker, Ted White, who opened his own real estate firm, Ted White *799 and Company, Inc., in October 1991. Mr. White had previously worked for another such firm, Raskin, Matsan and Cohen. His duties as a broker were to lease apartments to clients who responded to advertisements in the New York Times. The clients paid for his services on a commission basis.
In October 1991, Mr. White contacted defendant, who he knew from the real estate business, to inform him that he was opening his own office. Mr. Koeppel then asked Mr. White to make a contribution to the Bush re-election campaign. When Mr. White refused, Mr. Koeppel told him that it would be "a good idea for someone going out and opening their own business” to make such a donation. Mr. White agreed to make a $1,000 donation to the Bush/Quayle campaign and handed a personal check to Mr. Koeppel. Exhibit 3 is a copy of the canceled check. Defendant thanked Mr. White and directed him to take a copy of the latest apartment listings in the Koeppel buildings on his way out of the office.
On September 22 and 24, 1992, Mr. White spoke to defendant concerning applications for apartments at 350 East 52nd Street and 141 East 89th Street in New York County. During these conversations, defendant asked Mr. White to make a $1,500 contribution to the Giuliani Mayoral campaign. Mr. White told defendant that he couldn’t afford even $1,000. At least one of the applications went through, nevertheless, and Mr. White’s client received a lease. In October 1992, Mr. White attempted to process an application for a rent-stabilized apartment at 250 East 73rd Street. The apartment was leased to one of Mr. White’s employees who had to relocate, wished to end her lease early and had found a potential tenant to replace her. Grand Jury exhibit 4 is a copy of the application submitted by Mr. White’s firm for rental of that apartment. Defendant told Mr. White on the telephone that Mr. White’s employee would be released from her lease and his firm could broker the rental to someone else only if a contribution of $2,000 was made to the Giuliani election campaign. Mr. White told Mr. Koeppel he did not do business that way. The employee was not allowed out of her lease and the client’s application for re-rental of the apartment was rejected. Shortly after, in December 1992, Mr. White submitted an application on behalf of a client for a rent-stabilized apartment at 350 East 52nd Street. Again, defendant told Mr. White that unless he contributed $1,500 to Giuliani’s campaign, Mr. Koeppel would not "review [the] application * * * [or] rent the apartment to [Mr. White’s] client.” (Grand Jury transcript, at 35.) Mr. Koep *800 pel then told Mr. White that if he would not make political donations, the only other option was to co-broker their real estate listings. This would mean that defendant, who was not a licensed real estate broker would receive part of the broker’s commission for any consummated lease in one of his own buildings. Mr. White told defendant that he would not co-broker because it was illegal for a landlord to accept commissions from tenants in rent-regulated apartments since this would, in effect, allow the landlord to collect more than the legally permissible rent. Defendant responded that "he was going to put together a preferred brokers list; those who were willing to work with him on contributions or co-brokering. And if [Mr. White] wasn’t willing to do that, [he] won’t be getting [Koeppel’s] listing any longer.” (Id., at 36.)
Defendant solicited political contributions not only through brokers but directly from prospective tenants.
In October 1989, one such person, who testified before the Grand Jury, met with defendant to inquire about renting an apartment at 350 East 52nd Street. Mr. Koeppel told him that "there was a waiting list a mile long, and that if I wanted to obtain an apartment in his building, that I would have to make a [$1,000] contribution to Rudy Giuliani’s campaign.” (Grand Jury transcript, at 103.) The individual made the contribution and subsequently entered into a lease for the apartment at the rent-regulated maximum of $1,350. Exhibit 12 is a copy of the canceled check, dated October 6, 1989 and made out to Friends of Giuliani. Although the witness attended the fund-raiser, he would never have made the contribution had it not been a condition of obtaining the apartment.
Another individual testified that in October of 1991, he was living with his fiancée in a studio apartment in 350 East 52nd Street when he learned that a larger apartment in the building was available. He spoke with defendant on the telephone about obtaining the apartment. Defendant told him that the property was still available, other people were interested in it and "that if I was interested in securing the apartment I would have to buy tickets to an upcoming Giuliani fund-raiser at which [President] Bush was speaking.” (Id., at 93.) Defendant told this man that if he (Koeppel) sold the most tickets, at $1,000 each, he would get to fly back to Washington with President Bush on Air Force One. The individual offered to buy one ticket but defendant insisted that he could only have the apartment if he purchased three tickets. On October 10, 1989, the tenant handed defendant a check for $3,000 made out to *801 "Friends of Giuliani”. Grand Jury exhibit 11 is a copy of the canceled check. The lease for the apartment was then executed by the tenant and defendant. Although the tenant, his wife and a friend attended the fund-raising event for which he had contributed $3,000, the contribution was only made because it was a condition of obtaining the apartment.
There was evidence that none of the tenants received rent concessions from defendant and that each apartment in question was regulated by the Division of Housing and Community Renewal (DHCR). The Grand Jury also received documentary evidence from the New York City Campaign Board and the Federal Election Commission reflecting the donations described by the witnesses and, in some cases, listing defendant as the "intermediary.”
After presenting the evidence, the prosecutor instructed the Grand Jury on the law. First, he charged the definition of rent, gouging in the first degree. He charged the definition of a systematic ongoing course of conduct as contained in Penal Law § 190.65. He instructed on the meaning of "rental and other lawful charges” by reading the pertinent language from, inter alia, New York City Rent Stabilization Law (Administrative Code of City of NY) § 26-512 (a); § 26-517 (a).
THE MOTION TO DISMISS
On this motion, challenging the sufficiency of the evidence to support the indictment, "the defendant is entitled to a review based on whether there was competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant’s commission of it (CPL 70.10 [1])” (People v Mikuszewski, 73 NY2d 407, 411 [1989]). The evidence must be viewed most favorably to the People and need not provide " 'reasonable cause’ ” to believe that the defendant committed the crime charged. (Supra, at 411.)
Here, there was ample proof that defendant committed the crime of rent gouging in the first degree. The first element, that defendant’s actions were part of "a scheme constituting a systematic ongoing course of action,” requires proof that he engaged in a "planned pattern of conduct” as opposed to isolated ad hoc acts. (People v Kaminsky, 127 Misc 2d 497, 501 [Sup Ct, NY County 1985].) A scheme involves some connotation of planning and pattern. However, both the targets of the scheme and the defendant’s acts can differ from transaction to transaction. (People v Block & Kleaver, 103 Misc 2d 758 [Monroe County Ct 1980] [citing to Federal mail fraud cases]; *802 see also, People v De Muirier, 106 AD2d 266 [1st Dept 1984] [reinstating indictment charging scheme to defraud based on actions involving different victims].)
The evidence here showed that defendant engaged in a pattern of conduct over three years in which he demanded a contribution to a Republican political campaign from five people in regard to nine apartments as a condition of their obtaining a lease either for themselves or, in the case of brokers, for a client. Defendant admitted that his purpose was "to sell the most tickets” (Grand Jury transcript, at 94) to the particular event. Even without his admission there were enough common elements among each transaction to identify each "as having been undertaken pursuant to an over-all * * * design” (People v Kaminsky, supra, 127 Misc 2d, at 502), i.e., raising funds for Republican campaigns. More than sufficient evidence has been presented to establish that defendant’s actions were part of a scheme constituting a systematic, ongoing course of conduct.
Second, the scheme must be connected to the rental of three or more apartments regulated by law. This element was established by evidence that each of the nine apartments was regulated by DHCR. The third element requires solicitations from one or more persons in three separate transactions and receipt of some consideration of value in at least one instance. Here, the evidence established that defendant solicited five persons concerning nine apartments and, on six occasions, accepted financial contributions to Republican campaigns and candidates. Contrary to defendant’s contention, it is clear from the language of the statute that it prohibits not only solicitations directly from prospective tenants, but also from any person who acts on behalf of such tenants. The statute is addressed to soliciting, accepting or agreeing to accept consideration, from one or more persons, "upon an agreement or understanding that [this] will increase the possibility that any person may obtain or renew [a] lease.” (Penal Law § 180.57 [emphasis added].) Thus, the transactions in which defendant solicited and/or accepted contributions from the brokers, Chris Marr and Ted White, in order for their clients to obtain leases, fall well within the statute’s ambit.
There was also sufficient evidence that defendant knew the consideration was "in addition to lawful rental and other lawful charges”. (Penal Law § 180.57.)
Proof that defendant had knowledge of the DHCR rent status was both direct and circumstantial. (See, People v White, 101 AD2d 1037 [2d Dept].) Mia Sette testified that she executed her *803 lease in front of defendant and believe he signed it at that time. (Although the leases in evidence, including the Sette lease, were all signed by "Koeppel”, the first names are hard to decipher.) The first page of this and every lease in evidence contains a notice of rent stabilization, prominently displayed on top and the rent stabilization regulations are attached to the lease. The tenant for another apartment testified that he was handed the lease containing the rent stabilization notice by defendant, signed it in front of him and handed it back. Further evidence of defendant’s knowledge was his statement to Mr. Marr that one of the subject apartments was "very below market value,” thus revealing that he knew he could not raise the rent to market value because it was rent regulated. The evidence, taken as a whole, established that defendant was the person who decided if rent-stabilized apartments would be leased to the prospective tenants. Finally, the evidence indicated that he owned and managed rental buildings throughout Manhattan. Such proof supports the conclusion that defendant knew the regulatory status of the subject apartments.
THE EX POST FACTO CLAIM
Rent gouging in the first degree was added to the Penal Law effective November 1, 1991. Defendant argues that the Ex Post Facto Clause of the United States Constitution prohibits an indictment based in part on acts which occurred before that date. In fact, of the nine occasions when defendant solicited contributions, only four occurred prior to November 1, 1991. In any event, here, I have already found that defendant was properly charged with an offense which is a continuing crime, i.e., a scheme constituting an ongoing course of conduct. It is well established that a continuing crime may be charged as long as the acts underlying the crime continued to be committed after any statutory change. This is so despite the fact that some of the acts may have occurred before the statute’s enactment or amendment. (See, e.g., People v Rosich, 170 AD2d 703 [2d Dept 1991], lv denied 77 NY2d 1000 [grand larceny as a continuing crime properly charged where acts continued after statutory amendment]; People v Rivera, 156 AD2d 177 [1st Dept 1989], lv denied 75 NY2d 923 [no ex post facto violation where acts underlying grand larceny scheme continued after statute’s amendment].)
Because the Grand Jury heard evidence sufficient to establish every element of the offense charged and the defendant’s *804 commission of it and because the indictment does not violate the Ex Post Facto Clause of the Constitution, the motion to dismiss is denied.

. The client testified that he paid Mr. Marr a total commission of $2,450 for the apartment.

. She attended part of the function but did not stay for dinner. Ms. Sette also testified that many months later, when Mayor Giuliani’s office learned of the circumstances surrounding her contribution, she received a refund of the $1,750 from the Giuliani campaign. This, of course, does not affect the validity of the indictment.